**DOYLE WILSON HOMEBUILDER, INC., Appellant,**

v.

**David PICKENS, Barbara Pickens and Terry Maxwell Electric, Inc., Appellees.**

No. 03–98–00123–CV.

Court of Appeals of Texas, Austin.

July 1, 1999.

David M. Moore, Wilson, Grosenheider, Moore & Jacobs, L.L.P., Austin, for Appellant.

Lori Wiese, Cozen and O'Connor, Dallas, for David Pickens & Barbara Pickens.

David E. Dunham, Taylor & Dunham, L.L.P., Austin, for Terry Maxwell Electric, Inc.

Before Justices JONES, B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

To address concerns raised in the motion for rehearing, we withdraw our earlier opinion and judgment issued May 27, 1999 and substitute this one in its place. After a fire destroyed their home, appellees David and Barbara Pickens sued appellant Doyle Wilson Homebuilder, Inc. ("Doyle Wilson")[1] and appellee Terry Maxwell Electric, Inc., for various causes of action related to the construction and sale of the house. A jury determined that neither defendant acted negligently, but found that Doyle Wilson breached two warranties and failed to comply with the home sale agreement. Based on the jury's verdict, the trial court awarded the Pickenses $299,-399.88 in actual damages, plus prejudgment interest and attorney's fees. In six points of error, Doyle Wilson challenges the legal and factual sufficiency of the evidence supporting the trial court's judgment. We will reverse the judgment and remand the cause for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1992, David and Barbara Pickens signed a contract (the "home sales agreement") with Doyle Wilson for the construction of a house in Austin. In this written agreement, Doyle Wilson warranted that the construction would substantially comply with (1) the plans and specifications, (2) construction standards required under a warranty it offered, and (3) applicable building codes. Doyle Wilson representatives also told the Pickenses that Doyle Wilson would provide quality workmanship and materials, and that the house would be something they could live in for a long time. Doyle Wilson entered into a contract with Terry Maxwell Electric (the "contractor base agreement") to install the electrical wiring in the Pickenses' house. The contractor base agreement warranted that all materials furnished by Terry Maxwell would be of good quality and free of defects. The Pickenses moved into their new home in November 1992 and lived there until June 1994, when a fire broke out while the Pickenses were away and destroyed their home.

---

1. We will use "Doyle Wilson" to refer only to the appellant corporation, not the individual with that name.

The Pickenses' theory was that the fire resulted from problems with electric wiring in a truss area between the first and second floors, caused by either improper installation or defective materials. They sued Doyle Wilson and Terry Maxwell Electric, alleging negligence, breach of implied warranties of habitability and good and workmanlike performance of services, and violations of the Texas Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code Ann. §§ 17.41–.63 (West 1987 & Supp.1999) ("DTPA"). They also brought a strict liability claim against Terry Maxwell Electric, alleging that the company installed defective wiring. The Pickenses claimed actual damages for the loss of their house, out-of-pocket expenses, mental anguish, and emotional distress; they also sought attorney's fees, court costs, and interest.

### The Plaintiffs' Witnesses

David and Barbara Pickens both testified at trial. Their testimony established that there was no history of electrical problems with the house, and that they had never had any electrical repairs performed prior to the fire. While the house was under construction, they saw nothing in the work done by employees of Terry Maxwell Electric that gave them any cause for concern. During the eighteen months they lived there, the Pickenses felt that the house had been constructed in a good and workmanlike manner and they made no warranty claims. Nor did they experience any "tripping" of the circuit breakers due to electrical problems during that time.

Raymond Reynolds and Philip Wagner were the Pickenses' expert witnesses; they investigated the fire scene, co-authored a report on the fire that was offered in evidence, and testified at trial. Reynolds, a cause-and-origin expert with forty-two years of experience in fire protection, examined the house three days after the fire. He determined that the fire started in a truss assembly above the southeast corner of the family room.[2] Since the electric wiring running through the truss area was the only heat energy source capable of starting a fire in that location, Reynolds concluded that the fire was caused by a heat buildup in the wiring. He then relied on Philip Wagner, an electrical engineer, to examine the wiring further.

Reynolds and Wagner identified numerous electrical "faults"[3] in the wiring running through that area. In their report, they noted two defects that made them question the overall fire safety of the Pickenses' home. First, they observed some wiring tightly wrapped around a metal brace in the truss assembly; Reynolds testified that the sharp angle of the metal brace could wear through the wire insulation over time and eventually cause a fire. Second, they saw a staple nailed through a metal brace into the truss assembly.[4] However, both of these defects were located at least five or six feet from the fire's point of origin, and Reynolds and Wagner both acknowledged that the defects did not cause the fire. Wagner agreed that neither defect constituted a violation of the National Electric Code; moreover, he stated in the report that the "overall electrical

2. The truss area was a concealed space between the first and second floors of the house about eighteen inches high through which were laid heating and air conditioning vent pipes, as well as electrical wiring circuits to and from the circuit breaker panel box.

3. In the electrical context, a "fault" is defined as "a defective point in an electric circuit due to a crossing of wires, a ground, a break in the circuit, [or] a failure of insulation." *Webster's Third New International Dictionary* 829 (Philip B. Gove ed., 1986). Our examination

of the record did not reveal that either expert provided the jury with any explanation for the term.

4. The report also mentions that a wire inside a breaker box had an inch-long slit in its insulation, which Wagner described at trial as being "nicked." However, Reynolds and Wagner both referred only to *two* defects in their report and generally throughout their respective testimony at trial.

workmanship was considered to be good." Finally, the circuit breaker box was intact after the fire with all but four of the twenty breaker switches "tripped," indicating that the breakers had functioned properly.

Wagner inspected electrical wiring that was removed from the fire scene and detailed his findings in a section of the report. He found evidence of arcing, which he described as a manifestation of electrical energy "jumping" across a gap between two conducting wires. However, he was unable to identify any specific faulted wire as having caused the fire. Wagner's engineering analysis in the report concluded:

> It is our professional judgment that the fire was initiated by an electrical fault that occurred in the bundle of electrical cables located in the ceiling of the family room. There were multiple cables faulted in the same area and no definitive initiating event could be determined.

> Since these cables were faulted in an area with no obvious interference or obstruction, and no electrical storm or power surge event had occurred, it is the opinion of the engineer that the faults were caused by either a construction related problem with, or by an insect or rodent attack on, the electrical insulation. The owner reported he had no[t] experienced any problems with rodents or insects. Our examination found no indication of insect or rodent infestation. *Therefore, the insulation was probably faulty or damaged during the cable installation process.*

(Emphasis added.)

At trial, Wagner testified about several samples of wiring that were introduced in evidence. Wagner noted the large size of a fault bead[5] on one of the conductor wires, indicating that the wire had short-circuited. On the same section of wires, he pointed out that three of the four conducting wires had short-circuited but the other had not. Wagner described this as "interesting" since usually all four wires will short-circuit and weld together, or else none will; however, he did not relate this condition to the fire in any way. On a second sample, he testified that the presence of a copper bead on the wire signified that "the conductors were energized and there was electrical activity occurring." Wagner also testified that wiring can be damaged during installation if it is pulled tight against a sharp surface, which removes the wiring insulation "just like a potato peeler."

At trial, Wagner testified: "With regard to this fire we eliminated everything but an installation problem, and we noted examples of poor installation practices, and, therefore, concluded that the faulting was caused by a poor installation practice." However, under cross-examination he acknowledged that he could not say exactly what caused the fire. Wagner also testified on direct examination that he eliminated manufacturing defects in the wiring insulation;[6] on cross-examination, however, he acknowledged the conclusion in his report that a manufacturing defect and installation defect were the two possible conditions that could have caused the fire, and that the report did not specify if one was a more likely explanation than the other. Wagner admitted that a manufacturing defect remained a possible explanation, but said he did not detect any manufacturing defects in the wiring he examined. Although Wagner testified that there are some manufacturing defects that an electrician would not likely

---

5. Wagner explained to the jury that a "fault bead" results when copper wire melts due to an electrical condition (such as a short circuit) and resolidifies into a bead shape.

6. Reynolds also testified that neither a manufacturing defect nor an installation defect

could be ruled out; however, several times he disavowed having any expertise in electrical wiring, and suggested that Wagner would be better equipped to answer questions pertaining to how the fire might have started in the electrical wiring.

detect during installation, he stated that a defect in the wiring resulting in a lack of insulation would be "very obvious to the installer."

### The Defendants' Witnesses

The first defense witness called at trial was Ed Kirkham, a former fire chief and an investigator with more than forty years of experience; he testified for the defense regarding the origin and spread of the fire. Kirkham concluded that the fire probably started on the second floor of the house. It was his opinion that any problems with the installation of the wiring would have manifested themselves in some way during the eighteen months between the date Pickenses moved in and the date of the fire. Since the Pickenses had not reported any electrical problems during that time, and based on his review of the physical evidence of wiring from the fire, Kirkham concluded that the fire was not caused by anything Terry Maxwell Electric did in installing the wiring. Finally, Kirkham testified that structural wiring is responsible for only seven percent of residential fires, and that in all reasonable probability electrical problems did not cause the fire in the Pickenses' home.

Terry Maxwell testified about the electrical wiring his company installed in the Pickenses' house. Before a home buyer moves in, the wiring work is inspected by one of Terry Maxwell Electric's master electricians, by Doyle Wilson's inspector, and by an inspector with the City of Austin (the "City"). Maxwell personally performed a rough inspection of the Pickenses' house in 1992 and was satisfied with the work, and he testified that the house passed rough and final inspections by the City as well. He also noted that neither the City nor Doyle Wilson placed "red tag" correction notices on any of the work his company performed. Maxwell testified that his company's electricians are trained to look for defects in wiring insulation and improper wiring installation, and testified that if a wire was touching a metal plate it would be "red tagged" by his inspectors,

Doyle Wilson's inspectors, and the City's inspectors. He claimed that his company's work was passed by the City on its first inspection over ninety-five percent of the time.

Maxwell also testified that there were a number of tradespersons hired by Doyle Wilson to construct the Pickenses' house, such as plumbers, carpenters, and air conditioning installers. After the electrical installation was performed, Maxwell had no control over who was allowed to work around the electrical lines. He also agreed that the type of wiring insulation used in the Pickenses' house can be damaged by any number of construction activities, including stepping or dropping items on it. However, there was no evidence that any tradespersons actually damaged the electrical wiring.

Art Driskill, an electrical inspector for the City, testified by videotape deposition. Driskill testified that he conducted a final inspection of the Pickenses' house in October 1992 and that it passed both local and national standards. Driskill noted that he only inspected the light fixtures, plug switches, air conditioning connections, and the appliances that were installed at that time; however, he testified that those items had all been installed with reasonable care. Driskill testified that the electrical installation performed by Terry Maxwell Electric met the requirements of the National Electric Code, the State Rules Standard Book, and the City Code Amendments.

John Golding and John Kiracofe are respectively the chief and assistant chief of the Jollyville Fire Department; portions of their deposition testimony were read to the jury. Golding testified that he and Kiracofe responded to the Pickenses' fire and performed an unofficial investigation at the request of the Hudson Bend Fire Department. Golding and Kiracofe concluded that the fire originated in an exterior wall area near the junction between the first and second floors directly under a storage closet located in the sitting room

of the second floor. Although they ruled out arson, they were unable to determine an exact cause.

Michael Owen is an electrical training and consulting expert and holds a master electrician's license; he testified as a defense expert by deposition. Owen testified that for a fire to occur as the Pickenses theorized, there would first have to be an electrical fault, such as a short circuit, and then a failure of the circuit breaker protecting the wiring circuit. From the statement in Reynolds's and Wagner's report that after the fire most of the circuit breakers were found to have "tripped," Owen concluded that the breakers had functioned properly. Owen further testified that for the fire to have been caused by damaged wiring insulation, (1) the outer jacket would have to be torn; (2) at the same spot the insulation on at least two wires would have to be torn; (3) there would have to be physical contact between the two wires; and (4) the circuit breaker would have to fail to function properly. Based on this sequence of necessary events, Owen concluded that it was not likely that the fire resulted from damage to the wiring insulation. Owen also pointed out a faulty cause-and-effect assumption in Reynolds's and Wagner's report regarding faulting. Owen testified that the evidence of faults after the fire does not itself indicate that faulting *caused* the fire; on the contrary, it was more likely that the fire burned away the insulation around the wiring, creating a fault that tripped the circuit breakers.

The jury failed to find that either defendant's negligence proximately caused the fire. However, it found that Doyle Wilson breached (1) a warranty to perform services in a good and workmanlike manner, and (2) a warranty of habitability. It further found that Doyle Wilson failed to comply with the home sales agreement,

and engaged in "false, misleading or deceptive" acts in violation of the DTPA. However, the jury did not find that Terry Maxwell Electric failed to comply with the contractor base agreement. The jury awarded David and Barbara Pickens $20,000 each for mental anguish. Doyle Wilson moved for judgment non obstante veredicto ("n.o.v."); however, the trial court rendered a final judgment against Doyle Wilson for $299,399.88,[7] plus $51,458.38 in prejudgment interest and $40,000 in attorney's fees. The trial court ordered that the Pickenses take nothing by their claims against Terry Maxwell Electric. Doyle Wilson then moved for a new trial, which motion the court overruled.

Doyle Wilson raises six points of error challenging the trial court's judgment. In its first four points, appellant alleges that there is legally or factually insufficient evidence that it: (1) breached a warranty to build the house in a good and workmanlike manner; (2) breached a warranty of habitability; (3) failed to comply with the home sales agreement; and (4) engaged in DTPA violations. In its fifth point of error, Doyle Wilson argues that the jury's failure to find that Terry Maxwell Electric breached the contractor base agreement is contrary to the overwhelming weight and preponderance of the evidence. If the fifth point of error is sustained, Doyle Wilson asserts as a conditional sixth point of error that there is either no evidence or insufficient evidence to support the jury's finding that Doyle Wilson and Terry Maxwell Electric entered into the contractor base agreement with the intention that the agreement "directly and primarily" benefit the Pickenses.

## DISCUSSION

In reviewing a no-evidence challenge, we consider all the evidence in the light most

---

**7.** Question number ten, which asked the jury to determine the amount of the Pickenses' mental anguish damages, was the only damages question submitted. Appellant did not object to evidence that the Pickenses incurred $299,399.88 in actual damages, and that amount was apparently stipulated. In any event, the amount of damages is not directly at issue on appeal.

favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Associated Indem. Corp. v. CAT Contracting,* 964 S.W.2d 276, 285–86 (Tex.1998). We will uphold the finding if more than a scintilla of evidence supports it. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See Crye,* 907 S.W.2d at 499; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994); *see also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 522 (1991). In reviewing a jury verdict to determine the factual sufficiency of the evidence, we consider and weigh all the evidence and set aside the judgment only if the evidence is factually so weak, or the verdict so contrary to the overwhelming weight of the evidence, as to make the judgment clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *King's Estate,* 244 S.W.2d at 661; *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *see generally* Powers & Ratliff, 69 Tex. L.Rev. 515.

Doyle Wilson's first point of error alleges that there is either no evidence, or, in the alternative, insufficient evidence to support the jury's finding that Doyle Wilson breached a warranty to build the house in a good and workmanlike manner. As part of this argument, Doyle Wilson

urges that Wagner's testimony was not scientifically reliable under *E.I. du Pont de Nemours v. Robinson,* 923 S.W.2d 549 (Tex.1995), and *Sorensen v. Shaklee Corp.,* 31 F.3d 638 (8th Cir.1994). We will address this "unreliability" portion of appellant's no-evidence argument first.

### Appellant's Challenge to the Scientific Reliability of Wagner's Testimony

■ Appellees claim that Doyle Wilson has "waived its right to appeal based on no evidence and insufficient evidence as no objection was made to the reliability of the scientific evidence or admission of expert testimony at trial." In support of this argument, appellees cite *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402 (Tex.), *cert. denied,* —— U.S. ——, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998), in which the supreme court stated: "[T]o prevent trial or appeal by ambush, we hold that the complaining party must object to the reliability of scientific evidence before trial or when the evidence is offered." *Id.* at 409–10. Although appellees claim that Doyle Wilson did not request a *Daubert–Robinson*[8] hearing, the record indicates that at a pretrial hearing appellant's counsel moved to strike the testimony of Philip Wagner, the Pickenses' electrical expert, on the basis that his testimony was not scientifically reliable[9] under the *Robinson* standard. The trial court overruled appellant's motion. We conclude that Doyle Wilson has preserved its no-evidence points claiming unreliable methodology, and we will address them on appeal.

In *Robinson,* the Texas Supreme Court adopted the United States Supreme Court's "reliability" and "relevancy" re-

8. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

9. The parties apparently agree that Wagner's testimony is scientific in nature, and not "technical" or "other specialized knowledge" under Rule 702 of the Texas Rules of Evidence. We therefore assume without deciding that this label is appropriate. However, even if we were to view Wagner's testimony as non-scientific in nature, the *Daubert–Robinson* requirements of reliability and relevance would still apply. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998); *see also Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (same result under Federal Rule 702).

quirements for scientific expert testimony from *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and used them to decide whether the trial court had properly excluded testimony from the plaintiffs' expert that the defendant's contaminated Benlate product had damaged the plaintiffs' pecan trees. In affirming the trial court's exclusion, the *Robinson* court noted that the expert had no proof that the plaintiffs' Benlate was contaminated, and had no knowledge as to what amount or concentration of herbicides would damage pecan trees. *See Robinson,* 923 S.W.2d at 559. The supreme court reiterated the Eighth Circuit's criticism leveled at the testimony offered in *Sorensen*: "Instead of reasoning from known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what was needed to be known but what was not." *Id.* (quoting *Sorensen,* 31 F.3d at 649) (emphasis in *Robinson* omitted).

■ In the present case, Wagner testified that he eliminated other possible causes for the fire and explained his reasons for doing so. He then concluded that an electrical problem in the wiring had started the fire. We find Wagner's testimony distinguishable from the testimony held properly excluded in *Robinson.* While Doyle Wilson labels Wagner's testimony "rank speculation," Wagner did not simply guess at the fire's cause; instead, he testified that he deduced it by eliminating other possible causes, such as gnawing rodents or a surge from an electrical storm. In making his pretrial objection to Wagner's testimony, appellant's counsel did not develop any argument beyond his assertion that Wagner was improperly reaching a conclusion first and then hypothesizing facts to support that conclusion. Nor did counsel attempt to impeach Wagner at trial with any evidence that an electrical storm or gnawing animals actually caused the fire. The trial court did not abuse its discretion by allowing Wagner to testify. We therefore reject the *Daubert–*

*Robinson* "unreliability" argument appellant raises in points of error one through four.

### Appellant's General Claim of Factual and Legal Insufficiency

■ Our holding that the trial court did not abuse its discretion in refusing to exclude Wagner's testimony does not end our inquiry. Doyle Wilson's "unreliability" argument constitutes only a portion of its evidentiary sufficiency challenge; the remainder of appellant's argument is a broader assertion that there is no evidence, or insufficient evidence, to support the jury's finding that Doyle Wilson breached a warranty to perform services in a good and workmanlike manner. Points of error two through four make similar challenges to the jury's findings that Doyle Wilson breached a warranty of habitability, failed to comply with the home sales agreement, and committed DTPA violations. Because all four points of error are premised on the same underlying argument—that there is insufficient evidence linking any act or omission on Doyle Wilson's part to the cause of the fire—we will address these points together.

The Pickenses' theory at trial and on appeal is that the fire was caused by electrical wiring that was either (1) defective or (2) damaged when it was installed. The jury failed to find negligence on the part of either Doyle Wilson or Terry Maxwell Electric; it also did not find that Terry Maxwell Electric breached the contractor base agreement with Doyle Wilson. Therefore, to support the jury's answers that Doyle Wilson breached a warranty to perform services in a good and workmanlike manner, breached a warranty of habitability, and committed DTPA violations, there must be some evidence that the wiring was either (1) defective, or (2) damaged after installation by someone not under the control of Terry Maxwell Electric. Appellant cites a number of fire cases, which we will discuss.

In *Systech Financial Corp. v. Vaughn*, 558 S.W.2d 105 (Tex.Civ.App.—Tyler 1977, no writ), a corporate landlord sued its tenant after a fire damaged the tenant's apartment; the suit alleged that tenant negligently used or disposed of smoking materials. The evidence adduced at trial was that the tenant smoked and that the fire started in a sofa in the tenant's apartment. An investigator for the Dallas Fire Department also testified that in his opinion the fire was caused by careless smoking. At the close of the plaintiff's case, the trial court granted the tenant's motion for directed verdict. *See id.* at 105.

The sole issue on appeal was whether the trial court erred by instructing a verdict for the defendant because the plaintiff presented sufficient probative evidence of the tenant's negligence to create a fact issue for the jury. In affirming, the court of appeals explained:

> A presumption of fact cannot rest upon a fact presumed, or in other words, one presumption cannot be based upon another presumption nor an inference of fact upon other inferences.... Facts may be established circumstantially, but the circumstances themselves must be shown by direct evidence, and cannot be inferred from other circumstances....

*Id.* at 105–06 (quoting *Alamo Cas. Co. v. Stephens*, 259 S.W.2d 729, 735 (Tex.Civ. App.—Austin 1953, writ ref'd n.r.e.)). The court noted that to find that the tenant was smoking on the sofa, the jury would have to infer that fact from testimony about his smoking habits; after "indulging in this inference," the jury would then have to take another step and infer that the tenant was smoking carelessly. *Id.* at 106. Finally, the jury would have to make a third inference that careless smoking was the cause of the fire. Since there was no direct testimony allowing the court to pyramid those inferences, the court held that the testimony at best could arouse a mere surmise or suspicion of the tenant's negligence: "Evidence that it is possible that the [tenant] caused the fire here in-volved cannot be accepted as evidence he did so. It must be proved." *Id.*

Appellant also cites *John R. Francis Building Co. v. Bob Meador Co.*, 517 S.W.2d 693 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ). Francis was a home-builder; his company sued Meador, an air conditioning installation subcontractor, after a fire damaged a home Francis was building. At the time of the fire, the house was completed except for the instal-lation of an air conditioning compressor. Francis testified that on the morning of the fire, he drove by the house and recog-nized an employee of the defendant's un-loading an air conditioning compressor from one of the defendant's trucks. Fran-cis knew that the air conditioning work was the only work scheduled to be done on the house that day. When he returned several hours later, the house was on fire. *See id.* at 694.

The plaintiff's theory was that the defen-dant was negligent in using an acetylene torch to solder tubes from the compressor to tubes protruding from the side of the house. Francis took photographs showing three- to four-inch tubes coming out of the exterior wall, and testified that it was cus-tomary for such tubes to extend two feet. He testified that if shorter tubes are used, flames from the torch could easily travel through a tube and ignite insulating mate-rials on the interior wall of the house, a problem that would be exacerbated by the layer of air between the exterior brick of the house and the inside wall. The trial court granted an instructed verdict for the defendant at the close of the plaintiff's testimony. *See id.* at 694–95.

The court of appeals affirmed, stating:
> Negligence and causation may be estab-lished by circumstantial evidence. But neither negligence nor causation will be presumed. Nor can one presumption be based upon another presumption nor an inference of fact upon other infer-ences.... The mere happening of dam-age by fire is no evidence of a defect in the welding machine or that it was used

so as to permit sparks to enter the home.

*Id.* at 695 (citations omitted). From having seen the defendant's employee unloading an air conditioning compressor, together with the fact that no other work was scheduled for the day, the plaintiff inferred that the employee's negligence caused the fire. However, the court noted that the plaintiff failed to exclude the possibility that other persons were in the house during his absence or that the fire was started in some way other than the means alleged. The court held that the plaintiff failed to discharge its burden of proof that the defendant's employee was negligent and that his negligence proximately caused the fire.

The Pickenses argue that *John R. Francis Building Co.* and *Systech Financial* are distinguishable from the instant case because both were appeals from directed verdicts against the plaintiffs, and therefore the plaintiffs had the burden of proof on appeal. We do not find this distinction significant in the context of an evidentiary sufficiency review. Both cases are instructive on evidentiary sufficiency in fire cases and generally support appellant's argument; however, they address only the sufficiency of the evidence of negligence. Although negligence is not an issue in the present appeal because the jury failed to find either defendant negligent, these cases are still relevant because the Pickenses must link the fire's cause to Doyle Wilson to prevail.

Appellant also cites *Leatherwood Drilling Co. v. TXL Oil Corp.*, 379 S.W.2d 693 (Tex.Civ.App.—Dallas 1964, writ ref'd n.r.e.), to support its argument. In that case, Leatherwood had finished drilling an oil well and the rig was being serviced when a leak developed, resulting in a spill of crude oil on the ground. Several days later, the well caught fire and the rig was damaged. Leatherwood filed suit against TXL alleging negligence. Because there was no direct evidence as to the cause of the fire, Leatherwood relied on the following evidence: electric lights were left burning; valves on the casing head assembly were left open and electric motors were left running; and no flow line was attached to the casing head to enable the leaking oil to be carried away from the rig. The jury found that the fire was the result of unavoidable accident. *See id.* at 695–96.

One of the issues on appeal was whether the trial court erred in refusing to submit jury questions on whether the failure to turn off the motors was negligent. The court noted:

There is evidence that sparks could have come from the motors and could have caused the fire. But this is nothing more than speculation. There was also evidence that the fire could have been caused by a lighted match carelessly dropped, or a burning cigarette thrown to the ground. Evidence that a happening is possible cannot be accepted as evidence that it did happen.

*Id.* at 697. Because Leatherwood had offered no evidence that defendant's negligence caused the fire, the court affirmed the trial court's refusal to submit negligence issues to the jury. *See id.*

■ Appellees also claim that *Leatherwood* is inapposite because in that case, "there was evidence that the fire could have been caused by both a lighted match carelessly dropped, or a burning cigarette thrown to the ground. Conversely, the Pickens' experts ruled out every other conceivable cause of the fire and concluded that the fire was caused by the wiring." The problem with this argument is that appellees equate proof that the fire started in the wiring with proof of Doyle Wilson's liability. As *John R. Francis Building Co.* holds, causation may not be presumed. *See* 517 S.W.2d at 695. The plaintiff must offer some evidence of what the defendant actually did or failed to do to cause the fire—as opposed to mere conjecture about what *might have* happened—to survive a challenge to the sufficiency of the evidence. *See Bass v. General Motors Corp.*, 447 S.W.2d 443, 447 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.). Although

not submitted on that theory, the Pickenses' case bears strong resemblance to *res ipsa loquitur:* the fire appears to have started in an isolated area containing electrical wiring, therefore either the builder or the electrician must be at fault.[10] The case law does not support this approach.

In *Bass,* the plaintiff parked his car and returned six hours later to find the car on fire. Bass sued General Motors under several theories, including negligence and breach of warranty, alleging that the vehicle's defective wiring caused the fire. *See id.* at 444. A fire chief who had been at the scene testified that the fire was an electrical fire that resulted from a short circuit. Bass testified that he pulled the electric wires loose from the car's horn on the day preceding the fire, and had not reconnected the horn or done anything to safeguard the car from the loosened live wires. Bass had never complained to the dealer about the electrical system, and testified that the car operated normally after he disconnected the horn. The trial court granted the defendant's motion for instructed verdict. *See id.* at 444–45.

The court of appeals observed:

In our opinion plaintiff proved nothing more than the fact that the automobile was damaged as a result of an electrical fire.... There is no evidence in the record that the wiring was defective, that it was defective when it left General Motors, that the defect, if any, rendered the automobile unreasonably dangerous, or that any defect was the proximate cause of the fire, nor is there any evidence of faulty design. Proximate cause

is not to be presumed. It must be proved by evidence.

*Id.* at 447. Later, the court added:

All the evidence shows is that a fire occurred. Plaintiff concedes the fact that there is no evidence that the fire occurred because of any alleged defects, but argues that the evidence shows in all probability the fire resulted from alleged defects. Neither court nor jury could infer that the fire that did the damage was caused by a defect in the electrical system because the proof failed to show any defects existed in the electrical system.

*Id.* The court concluded that there was no evidence in the record to sustain the alleged breach of an express warranty, and affirmed the instructed verdict for the defendant.

*Bass* is facially distinguishable from the present case on at least two grounds. First, in *Bass* the plaintiff may have caused the fire by disconnecting the horn, whereas in the present case, there is no evidence that the Pickenses were at fault in any way. However, this fact would not appear to change the *Bass* court's conclusion that Bass "proved nothing more than the fact that the automobile was damaged as a result of an electrical fire." *Bass,* 447 S.W.2d at 447. Second, in *Bass* there was no expert testimony that the car's defective electrical wiring caused the fire; in contrast, the Pickenses' experts concluded that a faulty installation caused the home fire, although they conceded that a manufacturing defect remained a possibility. As we will discuss, however, the jury's

---

10. For example, plaintiffs' counsel asked David Pickens:

Q: Mr. Pickens, is Defendant's 8 [a photograph showing the gutted remains of the house] consistent with the representations made to you by Doyle Wilson representatives about the workmanship and the habitability of your home?

A: Clearly not.

Plaintiffs' counsel echoed this theme in closing argument when he told the jury: "[The defendants] had an obligation to put

it [the house] in a good and workmanlike fashion. They didn't. They had an obligation to put it in a habitable condition. *That fire gutted house is not habitable."* (Emphasis added.) Finally, appellees make the same argument in their brief: "It is hard to imagine that Appellant could suggest that the Pickens' [sic] house was safe, sanitary, or otherwise fit for living as the fire caused the total destruction of the Pickens' [sic] home...."

implicit rejection of both theories makes this distinction less meaningful.

Appellant also cites *Leroy v. Texas Gulf Sulphur Co.*, 309 S.W.2d 550 (Tex.Civ. App.—Galveston 1957, writ ref'd n.r.e.). In *Leroy,* the plaintiffs' decedents had been passengers in a motorboat operated by the defendant's employee Daunie. Upon leaving the dock, the boat was experiencing engine trouble; the boat was later found abandoned and burned to the waterline, and the bodies of Daunie and the plaintiffs' decedents were recovered from the river. There was no direct evidence as to what caused the fire. *See id.* at 552.

At trial, the plaintiffs' expert opined that the boat burned after an explosion from a gasoline fire. Testimony from other witnesses established that Daunie's body was more badly burned than those of the plaintiffs' decedents. From this evidence the plaintiffs' expert concluded that Daunie had been working near the engine and created a spark that caused the explosion. The court of appeals affirmed an instructed verdict for the defendant, noting that the expert's testimony "is manifestly merely surmise or suspicion on the part of the witness and not fact." The only fact in evidence, the court stated, was that the motorboat on which the plaintiffs' decedents had been riding had burned; any opinion as to the cause of the fire rested "purely upon speculation and surmise or upon inference." *Id.* at 554.

Appellees argue that *Leroy* is distinguishable from the present case because the expert in *Leroy* admitted that the boat fire could have been caused by other means, and that he did not know what had taken place. We disagree. In this case, Reynolds and Wagner similarly acknowledged that they could not state precisely what caused the fire; they arrived at their conclusion by theorizing various possible causes and using a process of elimination. Only minimal physical evidence supports their conclusion. And contrary to appellees' claim, they failed to eliminate all causes other than defective installation.

We find *Leroy* more analogous than distinguishable.

While numerous witnesses testified in the present case, the record reveals a lack of evidence of the fire's cause. The Pickenses felt that the house had been constructed in a good and workmanlike manner; they experienced no electrical problems and made no warranty claims during the eighteen months they lived there. Their experts Reynolds and Wagner admitted that they found no physical evidence of the fire's cause. Wagner stated that the overall electrical workmanship was good. While they noted two installation defects in their report, it is undisputed that neither imperfection caused the fire, and Wagner testified that neither constituted a violation of the National Electric Code. In sum, the plaintiffs' evidence presents at best a weak inference of causation that can be linked to Doyle Wilson.

Testimony from the defense witnesses tends to negate any suggestion of liability on Doyle Wilson's behalf. Defense expert Ed Kirkham testified that any problems with the wiring caused by the installation would likely have manifested themselves sooner than eighteen months; that structural wiring is responsible for only seven percent of residential fires; and that in all reasonable probability electrical problems did not cause the fire in the Pickenses' home. The investigating firefighters John Golding and John Kiracofe were unable to determine an exact cause of the fire. Terry Maxwell Electric's work on the Pickenses' house passed inspections by Doyle Wilson and by City inspectors, among others. All the testimony indicated that the work was of good quality. While Terry Maxwell testified that there were other tradespersons working around the electrical wiring that he did not control, no witness testified that any of the tradespersons actually damaged the wiring or were at fault in any way. No physical evidence suggests that one of them caused the fire. Defense expert Michael Owen testified that it was not

likely that the fire resulted from damage to the wiring insulation. He also challenged Wagner's conclusions by stating that it was more likely that the fire caused faulting in the electrical wiring, rather than the other way around.

The jury's negative answer to the question of whether Terry Maxwell Electric breached the contractor base agreement with Doyle Wilson is also revealing. In the contractor base agreement, Terry Maxwell Electric warranted that all materials would be "of good quality" and "free of defects."[11] The jury's failure to find a breach of this agreement was an implicit finding that the electrical wiring used by Terry Maxwell Electric was of good quality and free of defects, since any materials not in conformity were considered defective under the contract. While not conclusive due to the conflicting nature of the verdict, the jury's answer to this question indicates that the jury did not believe that either a manufacturing defect or improper installation by Terry Maxwell Electric caused the fire.

■ While the process-of-elimination methodology used by the Pickenses' experts makes the present case distinguishable from those cited above, the distinction is greater in form than in substance.[12] The experts' testimony cannot be given much weight, since the jury rejected their conclusion that the fire was caused by a "poor installation process" by failing to find that Terry Maxwell Electric was negligent or breached the contractor base

agreement. Moreover, the plaintiffs' theory involves exactly the type of piling inferences on inferences or presumption upon presumption that appellate courts have consistently rejected. One would have to infer from the two sample defects that a sharp edge or staple damaged the wiring insulation, and then infer that a fire resulted from this condition. "The circumstance that one of these surmises may correspond with a similar surmise made by a jury cannot raise the surmise to anything more than a conjecture which will not support a jury finding." *Texas Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex.1968). Looking at all the evidence in the record as whole, we find the evidence that Doyle Wilson breached a warranty to perform services in a good and workmanlike manner, breached a warranty of habitability, failed to comply with the home sales agreement, and committed DTPA violations so factually weak as to be manifestly wrong and unjust. We sustain the factual-sufficiency challenge appellant raises in points of error one through four.

■ On the other hand, we cannot say that there is *no* evidence of causation, i.e., legally insufficient evidence. Looking at the evidence in the light most favorable to the jury's verdict, we must accept Reynolds's and Wagner's testimony that they arrived at their conclusions by scientifically eliminating all other possible causes. Wagner's testimony, taken in conjunction with the faulted wiring samples entered in

---

11. The contractor base agreement specified that all materials used in the work "will be new unless otherwise specified in the contract documents, of good quality, free of defects, and in conformity with the contract documents. It is understood between the parties hereto that all equipment and materials not so in conformity are defective."

12. At trial, Wagner testified as follows regarding the procedure he and Reynolds used:

[The Pickenses'] home was new, it was well kept, it wasn't cluttered, it wasn't dirty, there were no nests—no birds' nests, insects, squirrels or anything like that in the area, and we asked the owners before we

left, you know, Have you had any problems, and they said, No. Why are you asking this question? But I mean, it was just a process of addressing potential causes so that—you know, *so it wouldn't appear that we were just moving in on one thing.*

(Emphasis added.) We share some of the concerns about the reliability of the experts' methodology voiced by appellant's counsel at the pretrial hearing. However, the trial court found Wagner's methodology sufficiently reliable and relevant to be admissible under *Robinson,* and on the limited record before us, we are satisfied that the court's ruling was not erroneous.

evidence and the two examples of wiring defects, can be viewed as providing more than a scintilla of support for the plaintiffs' theory that the wiring was defective or improperly installed. We believe that reasonable minds could differ on the issue of Doyle Wilson's liability under the theories raised in points of error one through four. Doyle Wilson's no-evidence arguments are therefore overruled.

Because we have sustained appellant's factual sufficiency argument, we do not reach Doyle Wilson's points of error five and six.

## CONCLUSION

The Pickenses had the burden of proof in this case. When their house was destroyed by fire, most of the physical evidence that might have indicated the cause of the fire was destroyed as well. The plaintiffs attempted to overcome this obstacle through the testimony of two expert witnesses who used a process-of-elimination method to arrive at the conclusion that the fire resulted from poorly installed wiring, although a manufacturing defect remained a possibility. While there may be more than a scintilla of evidence against Doyle Wilson on the liability theories advanced, after carefully weighing all the evidence we believe that it is factually insufficient to support the jury's findings of liability. It would be manifestly unjust to allow the verdict against Doyle Wilson to stand.

∎ Our original opinion of May 28, 1999, concluded: "We therefore reverse the trial-court judgment and remand this cause for a new trial." Doyle Wilson moved for rehearing, asking the Court to clarify that the judgment orders the *entire cause* remanded for a new trial, including

Terry Maxwell Electric. Terry Maxwell Electric responded by arguing that the Pickenses did not appeal any portion of the take-nothing judgment rendered in its favor,[13] and it should not have to defend itself again on claims by the Pickenses that a jury has rejected.

In support of its argument, Doyle Wilson relies on *Turner, Collie & Braden, Inc. v. Brookhollow,* 642 S.W.2d 160 (Tex. 1982). Brookhollow, a developer, contracted with Turner, Collie & Braden ("TCB") to design and supervise the construction of a sewer line; Brookhollow contracted with Whitelak to construct the line. When the sewer leaked and Brookhollow refused to pay Whitelak, Whitelak sued Brookhollow, which in turn brought a breach of contract cross-claim and a suit for indemnity against TCB. A jury found that TCB's negligence was the sole cause of the sewer's failure. The trial court awarded Whitelak damages against Brookhollow, for which Brookhollow was awarded indemnity against TCB; it also awarded Brookhollow an additional $298,472 on its cross-claim against TCB. *See id.* at 162–63.

The court of appeals reversed the portion of the trial court's judgment awarding Brookhollow damages on its cross-claim against TCB and remanded that part of the cause for a new trial; it affirmed the remainder of the judgment. The supreme court affirmed the reversal of Brookhollow's cross-claim, but held that the court of appeals had erred in failing to remand the entire cause for a new trial. The court observed:

> Brookhollow did not appeal the judgment in favor of Whitelak. As a general rule, when one party appeals from a judgment, a reversal as to him will not justify a reversal as to other nonappealing parties. This rule does not, howev-

---

**13.** Doyle Wilson did appeal the jury's failure to find against Terry Maxwell Electric, arguing in its fifth point of error that the jury's failure to find that Terry Maxwell Electric breached the base contractor agreement is contrary to the great weight and preponderance of the evidence. We do not reach this point of error because the reversal is based on our finding that there is insufficient evidence of Doyle Wilson's liability. We therefore believe it premature to consider this point of error in the absence of a sustainable finding of liability against Doyle Wilson.

er, apply where the respective rights of the appealing and nonappealing parties are so interwoven or dependent on each other as to require a reversal of the entire judgment. *Lockhart v. A.W. Snyder & Co.*, 139 Tex. 411, 163 S.W.2d 385, 392 (1942). In such a case, the court must reverse the entire judgment in order to provide the appellant with full and effective relief. *Saigh v. Monteith*, 147 Tex. 341, 215 S.W.2d 610, 613 (1948).

*Brookhollow*, 642 S.W.2d at 166 (further citations omitted). Noting that to remand only the cross-claim could produce inconsistent results, the supreme court declared this possibility "intolerable" and remanded the entire cause for a new trial. *Id.*

We believe that the *Brookhollow* exception applies in the present case. The Pickenses blamed both Doyle Wilson and Terry Maxwell Electric for causing the fire that destroyed their home. Doyle Wilson brought a cross-claim against Terry Maxwell Electric seeking contribution or indemnity in the event that it was adjudged liable to the Pickenses. If Terry Maxwell Electric is not included as a party in the remand for a new trial, a jury could find that Terry Maxwell Electric negligently installed the electric wiring and that Doyle Wilson is liable to the Pickens under the warranties it offered. Doyle Wilson would then be unable to recover any liability against it premised on Terry Maxwell Electric's negligence. While no money judgment was rendered on Doyle Wilson's cross-claim, we believe the parties' respective rights are sufficiently intertwined under *Brookhollow* to justify a complete remand.

The present case is distinguishable from two cases in which the supreme court reversed a lower court's decision to remand the entire cause. *Pat Baker Co. v. Wilson*, 971 S.W.2d 447 (Tex.1998), involved two sets of plaintiffs that independently appealed favorable verdicts to complain solely about the adequacy of damages awarded. *See id.* at 449. The court of appeals held that the jury's award to one plaintiff was against the great weight and preponderance of the evidence. After remanding that plaintiff's case for a new trial on both liability and damages, the court stated that the facts and issues related to the underlying accident were the same. Relying in part on *Brookhollow*, it therefore remanded the entire case without addressing the second plaintiff's claims. *See id.*

The supreme court reversed, distinguishing *Brookhollow* on several grounds. First, it noted that the appellant in *Brookhollow* specifically requested that the case be remanded in its entirety, whereas the plaintiffs in *Pat Baker* had not. Second, *Brookhollow* involved a cross-claim for indemnity, whereas in *Pat Baker* the amount of one plaintiff's recovery would not directly affect the other plaintiff's recovery. The instant case involves a claim for indemnity, and Doyle Wilson has specifically requested that the entire cause be remanded; it thus resembles *Brookhollow* more than *Pat Baker*.

Although not cited by either party, the reasoning in *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex.1989), informs our decision to remand the entire case before us. In that case, Fiberex, a manufacturer of fiberglass swimming pools, sued U.S. Steel, a manufacturer of resins used in Fiberex pools; it also sued Plas–Tex, a resin distributor. Plas–Tex filed a cross-claim against U.S. Steel for indemnity. The trial court found U.S. Steel liable to Fiberex but rendered a take-nothing judgment on Fiberex's claim against Plas–Tex, which judgment was not appealed by any party. The court of appeals reversed the judgment against U.S. Steel on the basis of factual insufficiency and remanded the entire cause for a new trial. *See id.* at 443.

The supreme court reversed, distinguishing *Brookhollow* by stating:

Although the underlying conduct of the defendants that gave rise to this action may have been interwoven, the rights of the parties at this point are

very distinct. There are three claims involved here: Fiberex's claim against Plas–Tex; Fiberex's claim against U.S. Steel; and Plas–Tex's cross-claim against U.S. Steel for indemnity. Fiberex's claim against Plas–Tex was resolved by a trial court judgment that Fiberex take nothing, which was not appealed; Plas–Tex therefore has no judgment against it and a new trial on this issue would be of no benefit.

*Id.* at 446. The court held that the court of appeals erred in remanding Fiberex's claim against Plas–Tex for a new trial.[14] *See id.*

The factual distinctions from *Plas–Tex* compel the opposite outcome in this case. In *Plas–Tex* it was the prevailing defendant (Plas–Tex) that filed a cross-claim for indemnity against the non-appealing defendant; the cross-claim expired when the take-nothing judgment in favor of Plas–Tex was not appealed. In the present case, Doyle Wilson has successfully appealed the adverse judgment against it; therefore, its cross-claim against Terry Maxwell Electric has not been extinguished. Second, the nature of the claim in *Plas–Tex* alleging a defective resin was such that remanding the cause to U.S. Steel alone did not create a risk of inconsistent judgments. Plas–Tex's liability as a distributor of allegedly defective resin was premised on U.S. Steel's liability for having manufactured the resin. Once Plas–Tex had been exonerated, there was no unfairness in remanding the cause as to U.S. Steel alone to determine its liability as manufacturer. In the instant case, a finding that the wiring was defective or improperly installed could implicate either Doyle Wilson, Terry Maxwell Electric, or both. *Plas–Tex* is not controlling in the present situation.

In the present case, the respective rights of Doyle Wilson and Terry Maxwell Electric are so interwoven as to require a

reversal of the entire judgment. We therefore reverse the trial-court judgment and remand the entire cause for a new trial in the interests of justice.

entitled to indemnity from U.S. Steel for its attorney's fees. *See* 772 S.W.2d at 446–47.

---

14. The supreme court allowed Plas–Tex to be made a party to the case on remand solely for the purpose of determining whether it was