TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00535-CV






Robert L. Codner, Appellant



v.



Roberto Arellano d/b/a Road Runner Concrete, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 97-09990, HONORABLE ERNEST C. GARCIA, JUDGE PRESIDING







 Appellant Robert L. Codner hired Audino Construction Company ("Audino") to act
as general contractor on a construction project to build a residence on a lot owned by Codner. 
Audino hired appellee Roberto Arellano, doing business as Road Runner Concrete ("Road
Runner"), as a subcontractor, to construct the foundation. When the completed house developed
foundation and shifting problems, Codner sued Audino and Road Runner, alleging violations of
the Texas Deceptive Trade Practices Act ("the DTPA") and negligence. On the first day of trial,
Codner settled with Audino and proceeded against Road Runner. The district court granted Road
Runner a directed verdict on Codner's claim that Road Runner violated the DTPA by breaching
an implied warranty of good-and-workmanlike performance. Only Codner's negligence claim was
submitted to the jury, which found no negligence on Road Runner's part. The district court
rendered a take-nothing judgment. Codner appeals the district court's refusal to submit his DTPA
cause of action, the court's exclusion of certain evidence, and the jury's finding that Road Runner
was not negligent. We will affirm.


Was the jury's finding of no negligence manifestly unjust?

 By his second issue on appeal, Codner argues that the jury's finding of no
negligence by Road Runner was so against the great weight and preponderance of the evidence as
to be manifestly unjust, a challenge to the factual sufficiency of the evidence. Oram v. State Farm
Lloyds, 977 S.W.2d 163, 168 (Tex. App.--Austin 1998, no pet.); Raw Hide Oil & Gas, Inc. v.
Maxus Exploration Co., 766 S.W.2d 264, 275-76 (Tex. App.--Amarillo 1988, writ denied). He
also argues there was no evidence to support Road Runner's defensive contentions, apparently
attacking the legal sufficiency of the evidence. Oram, 977 S.W.2d at 168, Raw Hide Oil & Gas,
766 S.W.2d at 275-76. Therefore, we will review both the legal and factual sufficiency of the
evidence.

 In reviewing the legal sufficiency of the evidence supporting a jury's finding, we
consider only the evidence and inferences that support the finding and disregard all evidence and
inferences to the contrary. Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989);
Oram, 977 S.W.2d at 168. If no evidence supports the finding, we then review the entire record
to determine whether the contrary proposition was established as a matter of law. Sterner, 767
S.W.2d at 690; Oram, 977 S.W.2d at 168. In evaluating factual sufficiency, we review the entire
record and set aside the finding only if it is so against the great weight and preponderance of the
evidence so as to be manifestly unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Oram,
977 S.W.2d at 168.

 In June 1995, Codner contracted with Audino to build a residential dwelling and
Audino hired Road Runner, as a subcontractor, to construct the dwelling's foundation. Codner
hired an inspection company that inspected and approved the placement of concrete forms and steel
inside the foundation before the concrete was poured; the inspection company did not check
whether the slab was level.

 During construction, Audino, as general contractor, was usually present during
Road Runner's construction activities. Audino expressed no concern over Road Runner's
procedures or the quality of its work. Codner testified that during construction, he saw a small
crack across the foundation slab and pointed it out to Audino, who said it was nothing to worry
about; it was a "curing crack." The City of Austin approved the house for residential use.

 In December 1995, when the house was substantially completed, Codner hired a
structural engineer, Jeff Tucker, to inspect the house because Codner was still concerned about
the crack he had seen. Tucker concluded the slab was not level by between one and three-quarters
to two and three-quarters inches. Tucker told Codner that the crack was of a structural nature and
recommended another inspection in six months to see if there was further movement.

 Codner testified that, starting in 1997, the walls and ceiling developed cracks and
one or two doors did not work properly. Codner removed the carpet and kitchen flooring and
discovered cracks in the concrete floor in a bedroom and the living room. Codner testified that
he had the cracks in the walls and ceilings repaired and repainted, but the cracks reappeared. In
August 1998, Codner had the cracks in the floor repaired, a cap put in to reduce the noticeable
slope in the floor, and new carpet and flooring installed. A core sample showed that a crack in
the bedroom floor went completely through the slab.

 At trial, Codner stated he had never had the soil inspected to see how expansive it
was, but admitted that the area "is notorious for having bad soils." Codner was aware of the lot's
difficult soil when he built the house. Specifically, he testified that the soil contains very
expansive clay and, before deciding to build the house, he knew clay swells and shrinks. Codner
was advised not to plant vegetation within five feet of the foundation, but stated there are trees
perhaps less than four and a half feet away from the foundation. Shortly before trial, Codner did
drainage work because rainwater was pooling on the ground near the foundation. He installed a
gutter to collect and move water away from the house, placing the gutter in the area he believed
had the most settling. Codner's property also includes an older house with a pier-and-beam
foundation that Codner admitted has had cracks in its walls and problems with doors and windows
sticking since before construction began on the new house.

 A real estate appraiser testified that, based on information provided by Codner, the
market value of the house would be reduced due to the "stigma" associated with having had
foundation problems. He further testified that he examined the house and did not notice the floor
was out of level. He said the doors worked and he did not detect any cosmetic or aesthetic
defects. He also said "regular routine cracking" in concrete is not a problem.

 Audino testified he was present while Road Runner installed the slab and Road
Runner did "everything they needed to do to install it correctly." Audino said he told Codner not
to worry about the crack because he believed it was a curing crack caused by the concrete
shrinking as it dried. Audino, not Road Runner, provided the concrete and fill material for Road
Runner's use.

 Codner called James Andrews, a licensed engineer, who testified that he inspected
the property and concluded the slab was poured out of level and would not remain stable because
the fill under the slab was not properly compacted. He said because the area had expansive soils,
foundations should be built strong enough to avoid breaking. Andrews concluded that Codner's
foundation was not strong enough to withstand the shifting in the area. Andrews found the slab
was out of level by about two and one-eighth inches, and the walls were not perpendicular to the
earth, a sign the slab was out of level when the walls were installed. Andrews believed the
concrete slab had broken into two discrete pieces. However, his conclusion was based not on a
personal visual inspection but on "another criteria." Andrews concluded the foundation was not
built in a good-and-workmanlike manner.

 Andrews admitted that his measurements indicating the walls were not
perpendicular were taken three years after the house was built; he based his conclusions on an
assumption that the walls were installed "reasonably close" to perpendicular. Andrews admitted
that his inspection method can "create some inaccuracies." At trial, Road Runner's attorney
questioned Andrews about guidelines Andrews had developed to investigate and evaluate
foundations. Andrews admitted he did not comply with a number of those guidelines, including
not recording the size, location, and type of vegetation near the foundation and not establishing
at least three sites to test the soil. Andrews considered the results of soil tests performed on but
one of several core samples taken from the foundation. He testified that although he believed there
was an empty space under the foundation that could have weakened the slab, the void might be
only a small area where there was a space between the slab and the fill.

 Andrews opined that the concrete Audino supplied was below strength
specifications, but said the concrete's low strength probably did not play a part in the settling. He
said the foundation settled most in areas where it rests not on fill but on bare dirt and where
rainwater pooled--areas on which he did not perform soil tests. Finally, he testified that expansion
in the soil did not play a part in the settling of the foundation because the foundation "was built
when the soils were already in a shrunk condition," thus any activity would have caused the slab
to rise, not settle, and soil shifting takes a longer time to affect a foundation than was indicated
in this case.

 Tucker, the engineer Codner initially hired, disagreed with Andrews's opinions. 
He said the deformation and soil conditions led him to believe the foundation experienced
movement after it was poured, not that the slab was poured out of level. Tucker stated that when
he first consulted with Codner, he might have said that the foundation's being poured out of level
was a possible cause of the shifting; however, he did not believe it was a likely cause. Instead,
he believed the measurements and shifting he observed indicated clay soil movement. Tucker said
some cracks across a slab are often normal, caused by the concrete shrinking as it dries. He
admitted he could not prove the slab was poured level because that would require elevation
measurements taken soon after it was poured. Tucker disagreed with Andrews's statement that
clay soils do not move substantially in time periods of less than ten or fifteen years, saying he had
seen substantial movement over short time periods all over Texas.

 Viewing the evidence in the light most favorable to the jury's verdict, we find the
evidence sufficient. Andrews testified that some of his methods could lead to inaccuracies. 
Tucker testified that he believed the shifting was due to poor soil conditions, not to negligence by
Road Runner. Codner admitted knowing there were expansive soils in the area, and Audino
testified that he did not see Road Runner perform its work in any way that raised his concern. The
jury was free to accept any or all of the testimony. McGalliard v. Kuhlmann, 722 S.W.2d 694,
697 (Tex. 1986). The evidence is legally sufficient to support the jury's verdict.

 Even when viewed in a neutral light, the entire record does not lead to a conclusion
that the jury's finding was manifestly unjust. Codner argues that because Road Runner did not
seek to introduce certain evidence, such as how much moisture was present when the foundation
was built or exactly how expansive the soils are, his evidence overwhelms Road Runner's
defensive evidence. However, Codner, as plaintiff, had the burden of proof and could have
brought forth such evidence to attack Road Runner's defenses. See Nelson v. Krusen, 678 S.W.2d
918, 929 (Tex. 1984) (Robertson, J., concurring). We hold the evidence is factually sufficient to
support the jury's finding of no negligence. We overrule Codner's second issue.


Should the district court have submitted Codner's DTPA claim

for breach of implied warranty?


 By his first issue, Codner attacks the district court's granting a directed verdict
against his DTPA claim that Road Runner breached "an implied warranty of good and
workmanlike performance in the construction of Codner's slab." We hold the district court did
not err in directing a verdict on Codner's implied-warranty claim.

Standard of Review

 In reviewing a trial court's granting of a motion for a directed verdict, we view the
evidence in the light most favorable to the party against whom the verdict was directed, and we
disregard all inferences and evidence to the contrary. Qantel Bus. Sys., Inc. v. Custom Controls
Co., 761 S.W.2d 302, 303 (Tex. 1988); White v. Southwestern Bell Tel. Co., 651 S.W.2d 260,
262 (Tex. 1983). If there is any evidence of probative value raising a material fact issue, we will
reverse the judgment and remand the case for determination of that issue. Qantel Bus. Sys., 761
S.W.2d at 304.


Does an implied warranty apply to Road Runner's services?

 Codner argues that the district court erred in refusing to submit a jury question on
his DTPA claim for a breach of an implied warranty.

 The DTPA creates no warranty; to be actionable under the DTPA's prohibition on
breaching implied or express warranties, a warranty must be recognized by common law or
created statutorily. Parkway Co. v. Woodruff, 901 S.W.2d 434, 438 (Tex. 1995); La Sara Grain
Co. v. First Nat'l Bank, 673 S.W.2d 558, 565 (Tex. 1984). An implied warranty will not be
imposed unless there is a demonstrated, compelling need for it. Rocky Mountain Helicopters, Inc.
v. Lubbock County Hosp. Dist., 987 S.W.2d 50, 53 (Tex. 1998); Parkway Co., 901 S.W.2d at
439; Melody Home Mfg. Co. v. Barnes, 741 S.W.2d 349, 353 (Tex. 1987); Dennis v. Allison, 698
S.W.2d 94, 95 (Tex. 1985). It is not necessary to impose an implied warranty as a matter of
public policy if the plaintiff has other adequate remedies to redress the alleged wrongs committed
by the defendant. Rocky Mountain Helicopters, 987 S.W.2d at 53; Dennis, 698 S.W.2d at 96;
Humble Nat'l Bank v. DCV, Inc., 933 S.W.2d 224, 239 (Tex. App.--Houston [14th Dist.] 1996,
writ denied).(1)

 There is little case law regarding implied warranties. It is well settled that a builder
of a residential house impliedly warrants that the house will be constructed in a good-and-workmanlike manner. Humber v. Morton, 426 S.W.2d 554, 561-62 (Tex. 1968).(2) Further, an
implied warranty to perform services to repair or modify existing tangible property in a good-and-workmanlike manner may arise under the common law if mandated by public policy.(3) See Rocky
Mountain Helicopters, 987 S.W.2d at 53; Parkway Co., 901 S.W.2d at 439; Melody Home, 741
S.W.2d at 353. Although we are here confronted with a service transaction, we find no case that
implies a warranty of good-and-workmanlike performance from a builder's subcontractor directly
to the homeowner.(4)

 As discussed above, it is clear that Codner could sue the general contractor; in fact,
he did sue Audino but opted to settle those claims rather than proceed to trial against Audino. Had
Codner proceeded to trial against Audino and received a verdict that Audino failed to build the
foundation in a good-and-workmanlike manner, Codner clearly would have had a right to a
judgment against Audino.(5) See Humber, 426 S.W.2d at 561-62. However, Codner chose to settle
his claims against Audino. Codner requested, and the district court submitted to the jury, a
negligence question solely against Road Runner. That Codner received an answer not to his liking
does not lead to the conclusion that there is a compelling need to establish an implied warranty
between Codner and Road Runner.

 Codner clearly had adequate remedies to redress the wrongs he alleges were
committed by Road Runner. Rocky Mountain Helicopters, 987 S.W.2d at 53; see also MacIntire
v. Armed Forces Benefit Ass'n, 27 S.W.3d 85, 91 (Tex. App.--San Antonio 2000, no pet.) (no
error to refuse to submit issue when court unable to find any published case extending implied
warranty to service provided by defendant and when plaintiff had other recourse against
defendant). We decline to apply, as a matter of public policy, an implied warranty to a dispute
such as this between a homeowner and a subcontractor.

 We hold that the district court did not err in refusing to submit to the jury a
question on Codner's theory that Road Runner breached a warranty of good-and-workmanlike
performance. We overrule Codner's first issue on appeal.


Should the court have allowed Audino to testify that Road Runner was negligent?

 Finally, by his third issue on appeal, Codner argues that it was error for the district
court to refuse to allow Audino to testify as to Audino's opinion of the cause of the shifting and
to exclude a letter in which Audino stated the concrete forms were installed out of level.

 The admission and exclusion of evidence is within the sound discretion of a trial
court. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); Waldrep v. Texas
Employers Ins. Ass'n, 21 S.W.3d 692, 703 (Tex. App.--Austin 2000, pet. denied). A trial court
abuses its discretion when it acts unreasonably or arbitrarily, or without reference to any guiding
principles. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991); Waldrep, 21
S.W.3d at 703. We will not reverse a ruling on the exclusion of evidence simply because we
disagree with the decision. Buller, 806 S.W.2d at 226; Waldrep, 21 S.W.3d at 703. A party
complaining of the exclusion of evidence must show (1) the trial court erred and (2) that error
probably resulted in an improper judgment. Alvarado, 897 S.W.2d at 753; Gee v. Liberty Mut.
Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). A successful challenge to an evidentiary ruling
usually requires the complaining party to show, based on the entire record, that the judgment turns
on the challenged evidence. Alvarado, 897 S.W.2d at 753-54. We ordinarily will not reverse an
erroneous evidentiary ruling if the challenged evidence is cumulative of other information and not
controlling on a material issue. Gee, 765 S.W.2d at 396.

 A lay witness may testify as to his opinions if the opinions are (1) rationally based
on his perception and (2) helpful to a clear understanding of his testimony or the determination of
a fact in issue. Tex. R. Evid. 701. An expert qualified by knowledge, skill, experience, training,
or education may testify if the expert's knowledge would help the trier of fact understand the
issues. Tex. R. Evid. 702. In general, if a party's discovery responses become incomplete or
incorrect, it must supplement or amend its discovery responses no later than thirty days before
trial. Tex. R. Civ. P. 193.5. If discovery responses are not timely supplemented or amended,
the undisclosed evidence may not be introduced unless the trial court finds that there was good
cause for the failure to amend or the failure to amend will not unfairly surprise or prejudice the
other parties. Tex. R. Civ. P. 193.6(a).

 Road Runner objected to Audino's testifying as to his opinion of the cause of the
shifting. Road Runner argued that Audino was an undisclosed expert witness because his opinion
was based on his extensive experience in the construction industry. Codner responded that Audino
had designated himself as an expert while still a party, and that Codner's error, if any, was in not
supplementing his discovery responses to designate Audino as one of Codner's experts. Codner
argued the district court had discretion to allow Audino to testify as an expert because Road
Runner would not be surprised or prejudiced by the testimony. Codner further argued Audino
should be able to testify to his opinion of the cause of the shifting based on his perceptions as a
lay witness. The district court excluded Audino's opinion testimony under rules 701 and 702 of
the Rules of Evidence, ruling Audino could testify about his perceptions but could not state his
opinion of the cause of the shifting. Tex. R. Evid. 701, 702.

 Road Runner also objected to the admission of a letter Audino had written in which
he stated, "When we built Mr. Codner's house addition in 1995, an error was made. Forms were
installed out of level. We admit it and have tried to be fair and settle this matter." Codner argued
there was no surprise or prejudice in allowing the letter into evidence. Road Runner objected that
the letter was written by Audino on his own behalf, not by Road Runner or on Road Runner's
behalf, contained hearsay and opinions of an undisclosed expert witness, and was improper,
prejudicial, and unfair if admitted against Road Runner. Codner responded that the letter was an
admission against interest, but Road Runner rejoined that it was not an admission against Audino's
interest, but against Road Runner's interest. The district court excluded the letter.

 Outside of the jury's presence, Audino stated that he would testify that the
foundation was poured out of level and Codner's problems were not due to settling. He went on
to say that about a year after the house was finished, he took elevations that led him to conclude
that the foundation was not level. He concluded the foundation had been poured out of level
because, if it had settled out of level, there would have been more cracking in the walls and
problems with doors. Audino said his experience in the construction business led him to this
conclusion. As for his statement that the forms were set wrong, Audino said he was not aware
of the problem at the time of construction but reached that conclusion later. He said that in
addition to his twenty-years experience in the business, a fair amount of his knowledge comes
from "just dealing with engineers on a pretty routine manner, getting their input on situations about
loads and these types of things and how much a building can expand and contract."

 Codner sought to have Audino testify about his opinions, drawn a year or more
after the foundation was poured and based on "being in the [construction] business for 20 years
and experiencing a lot of things." Codner failed to amend or supplement his discovery responses
to indicate he would call Audino as an expert witness. At trial, Codner's attorney argued that the
district court had the discretion to allow Audino's testimony because it would not unfairly surprise
or prejudice Road Runner. We cannot say that, under these circumstances, the district court
abused his discretion in excluding Audino's opinion testimony. Alvarado, 897 S.W.2d at 753-54;
Waldrep, 21 S.W.3d at 703.

 Even assuming it was error to exclude Audino's testimony about the cause of the
shifting, Codner has not shown that his case turns on Audino's testimony. Codner states in his
brief that Audino's testimony "would have been of extreme importance" and that Audino was
"perhaps the best qualified witness" on the issue of Road Runner's negligence. However, Audino
would have testified that he believed the slab had been poured out of level. Andrews testified to
essentially the same thing. Codner has not met his heavy burden of showing that Audino's
testimony was essential to his claim and that the district court clearly abused his discretion. 
Alvarado, 897 S.W.2d at 753-54; Waldrep, 21 S.W.3d at 703-05. We overrule Codner's third
issue.


Conclusion

 Having overruled Codner's issues on appeal, we affirm the district court's
judgment.



 

 Lee Yeakel, Justice

Before Justices Yeakel, Patterson and Jones*

Affirmed

Filed: February 28, 2001

Publish



* Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).

1. Further emphasizing the reluctance with which courts imply warranties as a matter of public
policy, in a concurring opinion in Melody Home, Justice Gonzalez criticized what he termed the
plurality's creation of a "new" implied warranty in service transactions. Melody Home Mfg. Co.
v. Barnes, 741 S.W.2d 349, 356 (Tex. 1987) (Gonzalez, J., concurring). Justice Gonzalez
observed that "[w]e have heard no public outcry indicating that services consumers' existing
remedies are inadequate," and went on to discuss existing remedies for consumers in such
transactions. Id. at 357-60.
2. In Humber, the builder was also a vendor, having constructed a dwelling on property he
owned before selling both the dwelling and real estate to the plaintiff. Humber v. Morton, 426
S.W.2d 554, 555 (Tex. 1968).
3. Melody Home has been interpreted to impose two requirements in applying an implied
warranty to a service transaction: first, the plaintiff must be without adequate alternative remedies
to redress the alleged harm; and second, the warranty should only extend to services provided to
remedy defects existing at the time of the transaction. Parkway Co., 901 S.W.2d at 439; Humble
Nat'l Bank, 933 S.W.2d at 239. Such a warranty would not apply here, where the suit concerns
new construction, not repairs or modifications made to existing property.
4. In Thomas v. Atlas Found. Co., 609 S.W.2d 302 (Tex. Civ. App.--Fort Worth 1980, writ
ref'd n.r.e.), the homeowners sued their general contractor and Atlas, a subcontractor who was
hired by the general contractor to construct a porch. 609 S.W.2d at 303. The jury awarded the
homeowners damages against Atlas, the subcontractor, and nothing against the general contractor. 
Id. Atlas did not appeal, and thus, was "deemed satisfied that it [was] liable to" the homeowners. 
Id. Instead, the homeowners appealed, seeking attorney's fees and treble damages under the
DTPA. In its discussion of a breach-of-warranty action under the DTPA, the court of civil appeals
stated, "Atlas agreed to construct the porch. By so doing, Atlas impliedly warranted that all such
work would be done in a good and workmanlike manner." Id. The court went on to say that an
implied warranty of good-and-workmanlike performance, which may be found between a
contractor and consumer, "would likewise operate to create a like obligation of the subcontractor
to the consumer." Id. at 304. To support this broad conclusion, the court cited Certain-Teed
Products Corp. v. Bell, 411 S.W.2d 596 (Tex. Civ. App.--Amarillo 1966), aff'd, 422 S.W.2d 719
(Tex. 1968), and Metropolitan Casualty Co. v. Medina Rural High School District No. 5, 53
S.W.2d 1026 (Tex. Civ. App.--San Antonio 1932, writ dism'd). However, neither Certain-Teed
nor Metropolitan Casualty involve claims made against subcontractors and neither case even
discusses subcontractor liability. Certain-Teed, 411 S.W.2d at 599; Metropolitan Cas., 53
S.W.2d at 1028. The Fort Worth court's conclusion is no more than dicta. Atlas did not appeal
the jury's finding that it was liable for breaching an implied warranty; thus, the issue of its liability
to the homeowners as a subcontractor was not at issue. Thomas, 609 S.W.2d at 303. To the
extent that Thomas may be said to be authority for the imposition of an implied warranty from a
subcontractor to a homeowner, we decline to follow it.


 The Texas Construction Law Manual three times asserts that a subcontractor may be sued
directly by a homeowner for breach of an implied warranty of good-and-workmanlike
performance. Joe F. Canterbury, Jr., Texas Construction Law Manual §§ 7.34, 10.16, 10.30 (2d
ed. 1992). First, in a section covering implied warranties in general, Canterbury states, "The
subcontractor's implied warranty to construct in a good and workmanlike manner can operate to
create obligations to the owner of a project even though there may be no privity of contract
between the subcontractor and the owner." Id. § 7.34. Second, in the section titled, "Owner's
Claims against Subcontractors under DTPA," he states, "An owner's [DTPA] claims are not
limited to the general contractor. A claim may also be asserted against a subcontractor for breach
of warranty and/or a violation of § 17.46(b) of the act." Finally, in the section titled, "DTPA
Claims against Subcontractors," Canterbury says only, "The [DTPA] provides a cause of action
against a subcontractor similar to the rights of an owner against a contractor as discussed above
in [preceding sections]." Id. § 10.30. None of Canterbury's assertions is supported by reference
to authority. Instead, Canterbury offers authority only for the declaration that privity is no
required in a DTPA action.


 In Doyle Wilson Homebuilder, Inc. v. Pickens, 996 S.W.2d 387 (Tex. App.--Austin 1999,
pet. dism'd by agr.), a homeowner sued his general contractor and subcontractor. The jury found
the subcontractor had not breached its agreement with the contractor and had not negligently
caused a fire in the homeowner's dwelling. 996 S.W.2d at 392. This Court did not reach the
question of whether a suit for breach of an implied warranty of good-and-workmanlike
performance could properly be brought by the homeowner directly against the subcontractor.
5. Our discussion in Thomson v. Espey Huston & Associates, Inc., 899 S.W.2d 415 (Tex.
App.--Austin 1995, no writ), is helpful, although we acknowledge that the particular question
addressed was different from the one raised here. In Thomson, we discussed whether a property
owner may sue a subcontractor, hired by the general contractor, for breach of contract. 899
S.W.2d at 417-18. We observed,


The contract between the property owner and the general contractor gives the
property owner the right to a finished building. Subsequent contracts between the
general contractor and subcontractors add nothing to this entitlement; the owner is
still entitled to the same building, regardless of the means by which it is
constructed. . . . If the subcontractors' performance falls short of what the owner
is entitled to, it is the general contractor who has to make up the difference.


Id. at 419.


 contractor. 
Id. Atlas did not appeal, and thus, was "deemed satisfied that it [was] liable to" the homeowners. 
Id. Instead, the homeowners appealed, seeking attorney's fees and treble damages under the
DTPA. In its discussion of a breach-of-warranty action under the DTPA, the court of civil appeals
stated, "Atlas agreed to construct the porch. By so doing, Atlas impliedly warranted that all such
work would be done in a good and workmanlike manner." Id. The court went on to say that an
implied warranty of good-and-workmanlike performance, which may be found between a
contractor and consumer, "would likewise operate to create a like obligation of the subcontractor
to the consumer." Id. at 304. To support this broad conclusion, the court cited Certain-Teed
Products Corp. v. Bell, 411 S.W.2d 596 (Tex. Civ. App.--Amarillo 1966), aff'd, 422 S.W.2d 719
(Tex. 1968), and Metropolitan Casualty Co. v. Medina Rural High School District No. 5, 53
S.W.2d 1026 (Tex. Civ. App.--San Antonio 1932, writ dism'd). However, neither Certain-Teed
nor Metropolitan Casualty involve claims made against subcontractors and neither case even
discusses subcontractor liability. Certain-Teed, 411 S.W.2d at 599; Metropolitan Cas., 53
S.W.2d at 1028. The Fort Worth court's conclusion is no more than dicta. Atlas did not appeal
the jury's finding that it was liable for breaching an implied warranty; thus, the issue of its liability
to the homeowners as a subcontractor was not at issue. Thomas, 609 S.W.2d at 303. To the
extent that Thomas may be said to be authority for the imposition of an implied warranty from a
subcontractor to a homeowner, we decline to follow it.


 The Texas Construction Law Manual three times asserts that a subcontractor may be sued
directly by a homeowner for breach of an implied warranty of good-and-workmanlike
performance. Joe F. Canterbury, Jr., Texas Construction Law Manual §§ 7.34, 10.16, 10.30 (2d
ed. 1992). First, in a section covering implied warranties in general, Canterbury states, "The
subcontractor's implied warranty to construct in a good and workmanlike manner can operate to
create obligations to the owner of a project even though there may be no privity of contract
between the subcontractor and the owner." Id. § 7.34. Second, in the section titled, "Owner's
Claims against Subcontractors under DTPA," he states, "An owner's [DTPA] claims are not
limited to the general contractor. A claim may also be asserted against a subcontractor for breach
of warranty and/or a violation of § 17.46(b) of the act." Finally, in the section titled, "DTPA
Claims against Subcontractors," Canterbury says only, "The [DTPA] provides a cause of action
against a subcontractor similar to the rights of an owner against a contractor as discussed above
in [preceding sections]." Id. § 10.30. None of Canterbury's assertions is supported by reference
to authority. Instead, Canterbury offers authority only for the declaration that privity is no
required in a DTPA action.


 In Doyle Wilson Homebuilder, Inc. v. Pickens, 996 S.W.2d 387 (Tex. App.--Austin 1999,
pet. dism'd by agr.), a homeowner sued his general contractor and subcontractor. The jury found
the subcontractor had not breached its agreement with the contractor and had not negligently
caused a fire in the homeowner's dwelling. 996 S.W.2d at 392. This Court did not reach the
question of whether a suit for breach of an implied warranty of good-and-workmanlike
performance could properly be brought by the homeowner directly against the subcontractor.
5. Our discussion in Thomson v. Espey Huston & Associates, Inc., 899 S.W.2d 415 (Tex.
App.--Austin 1995, no writ), is helpful, although we acknowledge that the particular question
addressed was different from the one raised here. In Thomson, we discussed whether a property
owner may sue a subcontractor, hired by the general contractor, for breach of contract. 899
S.W.2d at 417-18. We observed,


The contract between the property owner and the general contractor gives the
property owner the right to a finished building. Subsequent contracts between the
general contractor and subcontractors add nothing to this entitlement; the owner is
still entitled to the same building, regardless of the means by which it is
constructed. . . . If the subcontractors' performance falls short of what the owner
is entitled to, it is the general contractor who has to make up the difference.


Id. at 419.


 contractor. 
Id. Atlas did not appeal, and thus, was "deemed satisfied that it [was] liable to" the homeowners. 
Id. Instead, the homeowners appealed, seeking attorney's fees and treble damages under the
DTPA. In its discussion of a breach-of-warranty action under the DTPA, the court of civil appeals
stated, "Atlas agreed to construct the porch. By so doing, Atlas impliedly warranted that all such
work would be done in a good and workmanlike manner." Id. The court went on to say that an
implied warranty of good-and-workmanlike performance, which may be found between a
contractor and consumer, "would likewise operate to create a like obligation of the subcontractor
to the consumer." Id. at 304. To support this broad conclusion, the court cited Certain-Teed
Products Corp. v. Bell, 411 S.W.2d 596 (Tex. Civ. App.--Amarillo 1966), aff'd, 422 S.W.2d 719
(Tex. 1968), and Metropolitan Casualty Co. v. Medina Rural High School District No. 5, 53
S.W.2d 1026 (Tex. Civ. App.--San Antonio 1932, writ dism'd). However, neither Certain-Teed
nor Metropolitan Casualty involve claims made against subcontractors and neither case even
discusses subcontractor liability. Certain-Teed, 411 S.W.2d at 599; Metropolitan Cas., 53
S.W.2d at 1028. The Fort Worth court's conclusion is no more than dicta. Atlas did not appeal
the jury's finding that it was liable for breaching an implied warranty; thus, the issue of its liability
to the homeowners as a subcontractor was not at issue. Thomas, 609 S.W.2d at 303. To the
extent that Thomas may be said to be authority for the imposition of an implied wa