In The

Court of Appeals

For The

First District of Texas

____________

NO. 01-00-00450-CV

____________


J.M. KRUPAR CONSTRUCTION CO., INC. A/K/A JMK CONSTRUCTION,
Appellant


V.


DR. WADE R. ROSENBERG AND ABERCROMBIE BUILDERS, INC., Appellees


* * * *


DR. WADE R. ROSENBERG, Appellant


V.


J.M. KRUPAR CONSTRUCTION CO., INC. A/K/A JMK CONSTRUCTION AND
ABERCROMBIE BUILDERS, INC., Appellees


* * * *


ABERCROMBIE BUILDERS, INC., Appellant


V.


DR. WADE R. ROSENBERG, Appellee






On Appeal from the 151st District Court

Harris County, Texas

Trial Court Cause No. 96-37132






O P I N I O N

 Plaintiff, Dr. Wade R. Rosenberg, sued defendant Abercrombie Builders, Inc. for
violations of the Texas Residential Construction Liability Act (1) and the Texas Deceptive
Trade Practices-Consumer Protection Act (DTPA) (2) for damages allegedly resulting from the
faulty design and construction of Rosenberg's home. Abercrombie Builders filed a separate
suit against defendant J.M. Krupar Construction Co., Inc. (JMK), which built the foundation,
and others who were involved in the design and landscaping of the home. Rosenberg
intervened in Abercrombie Builders' lawsuit and non-suited the defendants in the first
lawsuit. The trial judge realigned the parties, making Rosenberg the plaintiff and all other
parties defendants. A jury found in favor of Rosenberg on his claims against Abercrombie
Builders and JMK and in favor of Abercrombie Builders on its claims against JMK. The trial
court rendered judgment on the verdict, except for the jury findings of mental anguish in
favor of Rosenberg, which the court disregarded, and awarded an additional $1,100,000 to
Abercrombie Builders against JMK. (3) The judgment also dismissed all claims against five
defendants who are not parties to this appeal. JMK appeals the judgment, Rosenberg appeals
the trial court's ruling on mental anguish and the calculation of prejudgment interest, and
Abercrombie Builders appeals the jury's allocation of 40 percent of the responsibility for
Rosenberg's damages to Abercrombie Builders' negligence. We reverse the judgment and
render judgment that Rosenberg and Abercrombie Builders take-nothing by their suit against
JMK. 

BACKGROUND


 Abercrombie Builders was the general contractor for the construction of a home for
Rosenberg. Abercrombie Builders subcontracted with JMK to build the foundation,
according to specifications set forth by an engineering firm. These specifications included
a two-foot deep foundation pad of select fill, an inactive soil, to stabilize the foundation. The
foundation was completed in August 1990, and the home was completed in 1991. 

 In the fall of 1992, Rosenberg noticed a crack in an exterior wall and another on an
interior wall of the house. In response to his call, the architect and builder inspected the
cracks and said they were caused by normal settling. Thinking he should get another opinion,
Rosenberg hired Wilson Wan, an independent engineer, in February 1993 to inspect the
house. Wan provided Rosenberg with a written report detailing various cracks and
separations, and Wan recommended (1) checking for leaks in the storm drain and downspout
connections, (2) checking for surface runoff ponding at the corner of the house, and (3)
coring through the garage slab to determine whether the select fill was properly prepared and
compacted. Rosenberg followed the first two recommendations, but did not follow the third. 
In May 1993, an agent for Rosenberg used the Wan report to challenge the Harris County
Appraisal District's tax appraisal of the house. The agent testified before the appraisal board
that the house had foundation problems, and he used the Wan report and photographs
showing damage to the house to support the challenge. The board reduced the appraisal by
$41,200. 

 At some point, Rosenberg had the cracks repaired, but, by the fall of 1993, they had
returned, were larger, and appeared in other places. Alarmed, Rosenberg called Richard
Peverley of Peverley Engineering Incorporated, who determined that the east side of the
house was three inches higher that the west side and informed Rosenberg that the house had
foundation problems. The Peverley report stated: 

 Because the deflections that have occurred in this foundation are in excess of
accepted design criteria, it is our opinion that it has failed to perform the
function for which intended and is in need of immediate repair. 


 Before any foundation repair work can be done or foundation plans and
specifications created, it is essential that soils and concrete testing be
conducted by an independent laboratory for the express purpose of
determining if the residential building was constructed in conformance
with the plans. The following is recommended. A minimum of three (3)
concrete cores should be extracted from the foundation and tested in
accordance with ASTM C-42. . . . In addition, soil samples should be
extracted through the core holes and the soil under the foundation
examined for type, foreign material, and bedding sand. 


 . . . . 


 The foundation of this residence was observed to have incurred deflections
which caused a severe amount of damage to other structural components.
. . . First the foundation does indeed slope in a downward direction from the
front wall toward the center of the foundation and toward the West wall in the
master bedroom area. The foundation also has an upward slope toward the
utility room and toward the garage. Second, the degree of slope is extremely
severe . . . . Foundation-induced damage observed included cracks on exterior
brick veneer, wide separations between brick veneer and window frames,
separations of upper facia board, cracks on interior sheetrock walls,
separations between molding and sheetrock, door frames which had been
distorted to be out-of-square, and floors that were in an obvious sloping
condition. . . . 


 . . . . 


 When deflections occur in a residential foundation that are sufficient to
damage other structural components, one can conclude that the foundation has
failed to perform the function for which intended. 


 . . . . 


 . . . . Thus, the deflections in this foundation must be concluded to
constitute the failure of a major structural element. 


 . . . . Certainly, residential buildings which have incurred such damage in the
greater Houston area can not be sold at their fair-market value, or possibly not
even sold at all, until the foundation has been repaired. In our opinion, the
conditions observed during this inspection are sufficiently severe that
repairs are required to establish the original state of livability and habitability
that the owner had anticipated when the property was purchased. 


In its conclusion, the report stated: 


 Based upon the observations made during this inspection, it is our opinion that
the foundation of this residential building has failed to perform the function
for which intended and, as a result, has caused a sufficient amount of
damage to other structural components to adversely affect the
livability/habitability of this building. On this basis, it is our
recommendation that the foundation should be repaired to not only bring it into
a reasonably level, but also a dynamically stable condition.


(Emphasis added.) 


 Believing the problem to be serious, Rosenberg sought legal counsel. Over the next
two years, the house was inspected several more times, and, in the fall of 1995, core drilling
revealed that the slab was not built on a pad of select fill and that, in fact, there was no pad
at all. 

 Rosenberg filed his suit against Abercrombie Builders in December 1994. 
Abercrombie Builders filed its suit against JMK and other defendants in July 1996. The
parties to the lawsuit styled Rosenberg v. Abercrombie Builders agreed, in writing, that
Rosenberg could take a non-suit in that case and intervene in the Abercrombie Builders v.
JMK case and Abercrombie Builders would not assert limitations as a defense. 

 The case was tried to a jury in late September and October 1998. Rosenberg and
Abercrombie Builders reached a tentative settlement early in the trial, but did not finalize it
until about half-way through the trial. The parties to the agreement were Rosenberg,
Abercrombie Builders, and Scottsdale Insurance Company, Abercrombie Builders' insurance
carrier. In its final form, the agreement, entitled "Acknowledgment of Vicarious Liability
and Confession of Judgment with Covenant to Restrict Execution to Designated Assets,"
included the following terms: 

 1. Rosenberg and Abercrombie Builders would file a joint motion for
interlocutory judgment in which they would stipulate that Abercrombie
Builders was vicariously liable for its subcontractors' breach of contract and
that Rosenberg would recover actual damages only from Abercrombie
Builders. 


 2. Rosenberg and Abercrombie Builders would pursue their claims against JMK,
and Abercrombie Builders would not settle any claims without the approval of
Scottsdale. 


 3. Rosenberg would be entitled to a judgment against Abercrombie Builders of
not more than $1,100,000 and not less than $755,000, to be based on the jury's
verdict, and Abercrombie Builders would be entitled to credits of $700,000
paid by Scottsdale and $55,000 in settlements from the other defendants except
JMK. Rosenberg would not execute on the judgment entered against
Abercrombie Builders, except that the first $345,000 of any proceeds of a
judgment for Abercrombie Builders against or settlement by JMK would be
paid to Rosenberg. 


 4. Scottsdale would dismiss its action for declaratory judgment filed against
Abercrombie Builders in federal court.


 5. Scottsdale would pay $700,000 to Rosenberg without admitting coverage. 


 6. Rosenberg indemnified Abercrombie Builders and Scottsdale as to any claims
asserted by Rosenberg. 


 7. Rosenberg and Abercrombie Builders released Scottsdale from any further
claims in connection with the lawsuit. 


 8. Rosenberg's release applied only to Scottsdale, the funds paid by Scottsdale
were not for punitive damages, and Rosenberg did not release his claims
against Abercrombie Builders. 


 As part of the consideration for the agreement, the parties agreed to keep the terms of
the agreement confidential. The agreement, in multiple counterparts, was signed on or about
October 9, 1998. A letter from Rosenberg's attorney to the attorneys for Abercrombie
Builders and Scottsdale, faxed on October 12, 1998, amended the agreement, at the
suggestion of the trial judge, to eliminate a requirement that Rosenberg approve any
settlement with JMK from an earlier version of paragraph two and to add, in paragraph three,
the "high-low" portion of the agreement. 

 The jury found that the negligence of Abercrombie Builders and JMK and their failure
to comply with their warranties proximately caused Rosenberg's damages and apportioned
40 percent of the liability to Abercrombie Builders and 60 percent to JMK. The jury found
that Rosenberg should have discovered the wrongful acts of JMK by November 1995. The
jury assessed damages for negligence and breach of warranty at $165,000 for reduction in
market value of the home after all repair work is completed, $314,673 in past repairs,
$30,000 in future repairs, $300,000 in past mental anguish, and $30,000 in future mental
anguish. 

 The jury further found that JMK engaged in a false, misleading, or deceptive act or
practice, engaged in an unconscionable act or course of action, and failed to comply with a
warranty; that these acts were a producing cause of Rosenberg's damages; and that
Rosenberg should have discovered these acts by November 1995. The jury assessed the same
damages for reduction in market value and past and future repair as for negligence. The jury
found that these acts were committed knowingly and assessed $150,000 in past mental
anguish damages, no future mental anguish damages, and $250,000 in additional damages. 
The jury also assessed $350,000 in attorney's fees and $60,000 in contingent appellate
attorney's fees. In addition, the jury found that JMK fraudulently concealed its wrongful or
negligent acts and that Rosenberg, in the exercise of reasonable diligence, should have
discovered those acts by November 1995. 

 In the issues submitted on behalf of Abercrombie Builders, the jury found that
Abercrombie Builders and JMK entered into a written agreement, that JMK failed to comply
with the agreement, and that Abercrombie Builders should have discovered the failure to
comply and the damages caused to Abercrombie Builders by November 1995. The jury
awarded damages of $32,936.50 for the difference in the value between the foundation JMK
agreed to build and the foundation JMK actually built. The jury also awarded $100,000 in
attorney's fees incurred through February 25, 1997, $150,000 in attorney's fees incurred from
February 26, 1997 through the trial, and $25,000 in contingent appellate attorney's fees. The
jury found that, when JMK entered into the written agreement with Abercrombie Builders,
JMK was aware of the requirement that it indemnify and hold harmless Abercrombie
Builders for damages sustained by Abercrombie Builders related to construction of the
foundation for the home. 

 The trial court disregarded the jury's award of mental anguish damages. The court
awarded damages to Rosenberg jointly and severally against JMK and Abercrombie Builders
and applied the $755,000 dollar-for-dollar settlement credit for a net award of actual damages
and attorney's fees of $164,673 plus prejudgment interest. The trial court awarded
Rosenberg $250,000 as additional damages under the Deceptive Trade Practices Act against
JMK. The trial court awarded Abercrombie Builders $1,132,936.50 as actual damages
against JMK, plus $275,000 as attorney's fees.

DISCUSSION


I. JMK'S APPEAL

 A. Rosenberg's Negligence and DTPA Claims

 In issue 2a, (4) JMK contends all Rosenberg's claims against JMK are barred by the
applicable statutes of limitations: two years for negligence and violation of the DTPA and
four years for common-law breach of an implied warranty. JMK argues that, even if the
discovery rule or the doctrine of fraudulent concealment applies to Rosenberg's claims, the
evidence is legally and factually insufficient to support the jury's finding that Rosenberg
should, in the exercise of reasonable diligence, have discovered the wrongful acts of JMK
in 1995. JMK contends that the evidence conclusively established that the limitations period
was tolled only until fall 1992 or fall 1993. 

 The discovery rule is a limited exception to the statute of limitations. Computer
Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996). The discovery rule is
applied when the nature of the injury is inherently undiscoverable. Id. at 456. Thus, the
discovery rule should be applied only when "it is difficult for the injured party to learn of the
negligent act or omission." Id. (quoting Willis v. Maverick, 760 S.W.2d 642, 645 (Tex.
1988)). The DTPA incorporates the discovery rule into the statute, providing that the claim
accrues when "the consumer discovered or in the exercise of reasonable diligence should
have discovered the occurrence of the false, misleading, or deceptive act or practice." Tex.
Bus. & Com. Code Ann. § 17.565 (Vernon 1987). Under both the DTPA and common-law
causes of action, accrual occurs when the plaintiff knew or should have known of the
wrongful injury. KPMG Peat Marwick v. Harrison County Fin. Corp., 988 S.W.2d 746,
749-50 (Tex. 1999) (rejecting the argument that a DTPA claim does not accrue until the
plaintiff knows not only of the injury, but the specific nature of the wrongful act that caused
the injury). A plaintiff need not know the full extent of the injury before limitations begin
to run. Murphy v. Campbell, 964 S.W.2d 265, 273 (Tex. 1997). 

 We consider only JMK's no-evidence contention. In reviewing a no-evidence issue,
we consider only the evidence and inferences that tend to support the finding, disregarding
all evidence and inferences to the contrary. Vannerson v. Vannerson, 857 S.W.2d 659, 666
(Tex. App.--Houston [1st Dist.] 1993, writ denied). If there is any evidence of probative
force to support the finding, we will overrule the issue. Id. When the evidence offered to
prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of the
fact's existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. 
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983); Seideneck v. Cal Bayreuther
Assocs., 451 S.W.2d 752, 755 (Tex. 1970). 

 It was Rosenberg's burden to plead and prove facts supporting the discovery rule. See
Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex. 1988). Generally, in
construction-defect cases, limitations begin to run when an owner becomes aware of property
damage. See Ben Fitzgerald Realty Co. v. Muller, 846 S.W.2d 110, 118-19 (Tex.
App.--Tyler 1993, writ denied) (limitations began when damages began to show on the
house); Hanmore Dev. Corp. v. JBK Enters., 776 S.W.2d 738, 740 (Tex. App.--Corpus
Christi 1989, writ denied) (limitations began when owner first discovered roof leak);
Tenowich v. Sterling Plumbing Co., 712 S.W.2d 188, 189-90 (Tex. App.--Houston [14th
Dist.] 1986, no writ) (limitations began when owner discovered leaks in pipe). 

 In this case, there were five discovery questions relating to Rosenberg's claims under
(1) negligence, (2) failure to comply with any warranty, (3) false, misleading, or deceptive
acts under the DTPA, (4) unconscionable actions under the DTPA, and (5) failure to comply
with any warranty under the DTPA. These questions were the same, except as they related
to the separate claims. They asked, "By what date should DR. WADE R. ROSENBERG, in
the exercise of reasonable diligence, have discovered [the actions of J.M. Krupar
Construction giving rise to the particular claim]?" Thus, the issue in this case, consistent
with the jury questions and the case law, is not when did Rosenberg discover JMK's
wrongful actions, but when should, in the exercise of reasonable diligence, Rosenberg have
discovered JMK's wrongful actions. Evidence of when he did discover is not necessarily
evidence of when he should have discovered. 

 Rosenberg contends that all his claims against JMK were timely filed because he did
not discover the actions of JMK giving rise to those claims until November 1995, as found
by the jury in five separate discovery questions. Rosenberg argues that, under the DTPA, the
discovery rule tolled the accrual of his cause of action until he discovered the cause of the
foundation failure--the absence of select fill--through the core drilling. This contention is
similar to that rejected by the supreme court in KPMG Peat Marwick, 988 S.W.2d at 749.

 In support of the jury's answers to the discovery questions, Rosenberg points to
evidence that JMK's contract was with Abercrombie Builders, not Rosenberg, and that
misrepresentations were made to Abercrombie Builders, who received JMK's invoice and
wrote the check paying JMK for the construction of the slab. Rosenberg argues that he first
discovered that there was no select fill beneath his foundation, and that the absence of the
select fill was the cause of his foundation problems, when he received an engineer's report
in November 1995 showing the result of core drillings in his slab. Although this is evidence
that Rosenberg did discover JMK's wrongful acts in November 1995, it is not evidence that
Rosenberg should not have discovered JMK's wrongful acts until that date. 

 Rosenberg first noticed cracks in his walls in the fall of 1992. Although Abercrombie
Builders and the architect reassured him it was due to normal settling, Rosenberg was not
satisfied and hired two engineers to inspect the house, Wan in February 1993 and Peverley
in the fall of 1993. Both engineers provided Rosenberg with written reports showing that the
house had foundation problems and itemizing other structural damage caused by the faulty
foundation. Both reports recommended that core drillings be made to determine whether the
foundation had been properly prepared and constructed. Rosenberg used the Wan report in
his challenge to the tax appraisal of the house's value by showing that the house had
foundation problems. The Peverley report concluded that the foundation had failed to
perform the function for which it was intended. Rosenberg followed two of Wan's
recommendations, but did not have the recommended core samples taken. He was concerned
enough to seek legal counsel after receiving the Peverley report, but, again, did not follow
the recommendation regarding core samples. 

 This evidence conclusively established that Rosenberg, in the exercise of reasonable
diligence, should have discovered the acts or omissions of JMK as they related to the
construction of Rosenberg's house foundation, whether presented in terms of negligence,
breach of warranty, or violations of the DTPA, at least by the fall of 1993. See id. There
is no evidence to support the jury finding that Rosenberg should not have discovered such
acts until November 1995. 

 The jury also found, in question number 20, that JMK fraudulently concealed its
wrongful or negligent acts or omissions and further found, in question number 21, that
Rosenberg should have discovered the wrongful acts so concealed by November 1995. 
Rosenberg contends that JMK's presentation of an invoice to Abercrombie Builders for
construction of a pad was the act of concealment. 

 We need not decide whether a misrepresentation by JMK to Abercrombie Builders is
fraudulent concealment as to Rosenberg, or whether Abercrombie Builders was entitled to
rely on the invoice as evidence that a pad had been built. Even if reliance on the invoice
was reasonable, the limitations under fraudulent concealment began when Rosenberg, in the
exercise of reasonable diligence, should have discovered the wrongful acts and omissions of
JMK--no later than the fall of 1993. See id. at 750. 

 Rosenberg's negligence and DTPA claims are subject to a two-year statute of
limitations, which was tolled until fall 1993. Rosenberg did not file his claims against JMK
until August 19, 1996, almost three years after limitations began to run. Therefore, the
negligence and DTPA claims are barred by limitations. Accordingly, we sustain JMK's issue
2a with respect to Rosenberg's negligence and DTPA causes of action. 

 Because we determine that Rosenberg's DTPA claims are barred, we need not reach
JMK's issue 2d regarding the jury's finding that JMK knowingly violated the DTPA or his
issue 2e regarding attorney's fees. 

 B. Rosenberg's Claim for Breach of Implied Warranty

 In issue 2b, JMK contends that Rosenberg's warranty claim fails as a matter of law
because a homeowner may not assert a claim for breach of good and workmanlike
performance against a subcontractor, citing Codner v. Arellano, 40 S.W.3d 666, 674 (Tex.
App.--Austin 2001, no pet. h.). 

 In Codner, a home-construction case, the general contractor hired a subcontractor to
build a foundation for the home. The foundation shifted and caused damage to the home, and
the home owner sued the contractor and subcontactor for negligence and violations of the
DTPA. The homeowner settled with the contractor. The trial court refused to submit issues
under the DTPA against the subcontractor, and only the question of negligence was
submitted to the jury. The jury found that the subcontractor was not negligent, and the
homeowner appealed, asserting that the DTPA issues should have been submitted to the jury. 
The court of appeals reasoned:

 [T]o be actionable under the DTPA's prohibition on breaching implied or
express warranties, a warranty must be recognized by common law or created
statutorily. An implied warranty will not be imposed unless there is a
demonstrated, compelling need for it. It is not necessary to impose an implied
warranty as a matter of public policy if the plaintiff has other adequate
remedies to redress the alleged wrongs committed by the defendant. 


Id. at 672 (citations omitted). The court went on to say:


 There is little case law regarding implied warranties. It is well settled
that a builder of a residential house impliedly warrants that the house will be
constructed in a good-and-workmanlike manner. Further, an implied warranty
to perform services to repair or modify existing tangible property in a good-and-workmanlike manner may arise under the common law if mandated by
public policy. Although we are here confronted with a service transaction, we
find no case that implies a warranty of good-and-workmanlike performance
from a builder's subcontractor directly to the homeowner. 


Id. at 672-73 (citations omitted). The court noted that, in another context, it had observed
that a homeowner had a contractual right to a finished building and the contract between the
contractor and subcontractor did not add to the homeowner's right; if the subcontractor does
not perform as it should, the contractor must make up the difference. Id. at 674 n.5 (citing
Thomson v. Espey Huston & Assoc., 899 S.W.2d 415, 419 (Tex. App.--Austin 1995, no
writ). The court declined "to apply, as a matter of public policy, an implied warranty to a
dispute between a homeowner and a subcontractor" and held that the trial court did not err
in refusing to submit a jury issue on breach of a warranty of good-and-workmanlike
performance. 

 Rosenberg argues that Codner is not dispositive or even persuasive because Codner
deals only with implied warranties and does not discuss express warranties. Rosenberg notes
that jury question numbers 4 and 12 ask whether JMK failed to comply with "any" warranty. (5) 
However, Rosenberg pleaded only breach of common law implied warranties with respect
to JMK. 

 We conclude that Codner is controlling. Rosenberg's remedy is against Abercrombie
Builders, which then may look to JMK for contribution or indemnity, as applicable to this
case. We hold that, under the facts of this case, Rosenberg does not have a cause of action
for common law breach of implied warranty against JMK. Accordingly, we sustain JMK's
issue 2b. 

 Because we have determined that Rosenberg's negligence and DTPA claims are
barred by limitations and that Rosenberg did not have a cause of action for breach of implied
warranty against JMK, we need not reach JMK's issue 2c regarding damages and issues 1
and 3a regarding the nature of the settlement agreement. (6) 

 C. Abercrombie Builders' Consequential Damages Claim

 In issue 3d, JMK contends Abercrombie Builders' claim for consequential damages
resulting from the breach of contract is barred by limitations. JMK argues that the
foundation was completed in summer 1990, the work was performed in full view of
Abercrombie Builders' on-site superintendent, and, therefore, neither the discovery rule nor
fraudulent concealment applies. 

 In this case, Abercrombie Builders' construction superintendent was on site every day
during the time JMK was performing its contract. The superintendent's daily construction
reports reveal that JMK first appeared on the site and discussed the slab with the
superintendent on July 23, 1990. According to these reports, JMK began its "excavation of
lot and build up of pad" on July 25, and JMK "completed pad and set finish floor elevation"
on July 26. The reports record the continuing work performed by JMK each week-day until
August 15, the date on which JMK poured the slab. On August 22, 23, and 24, JMK returned
to the site for clean-up and grading the yard. The reports show that on some days, one or two
other subcontractors were also on the site, but on many days, JMK was the only
subcontractor working. Under these conditions, JMK's failure to comply with its contract
was not inherently undiscoverable. Abercrombie Builders' superintendent was observing the
work as it progressed. There is no evidence that JMK's breach of its contract with
Abercrombie Builders was inhrently undiscoverable. Therefore, the discovery rule does not
apply to Abercrombie Builders' breach-of-contract claim against JMK. See Computer
Assocs., 918 S.W.2d 455. 

 Abercrombie Builders' cause of action for breach of contract accrued on August 24,
1990, the date on which JMK completed its work in connection with the contract. 
Abercrombie Builders did not file its lawsuit against JMK until July 1996. Therefore,
Abercrombie Builders' claim was barred by the four-year statute of limitations. Accordingly,
we sustain JMK's issue 3d regarding consequential damages. 

 D. Abercrombie Builders' Indemnity Claim

 In issue 3b, JMK contends that Abercrombie Builders is not entitled to indemnity
because the jury found Abercrombie Builders negligent and the indemnity clause of the
contract between Abercrombie Builders and JMK does not meet the express negligence test. 
A party who attempts to indemnify itself from its own negligence must satisfy two fair-notice
requirements: (1) the express negligence test and (2) a conspicuousness requirement. 
Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993). 

 The express negligence test was adopted by the Texas Supreme Court in Ethyl Corp.
v. Daniel Construction Co., 725 S.W.2d 705, 708 (Tex. 1987). The court stated, "The
express negligence doctrine provides that parties seeking to indemnify the indemnitee from
the consequences of its own negligence must express that intent in specific terms." Id. 

 The contract at issue in Ethyl provided:

 Contractor shall indemnify and hold Owner harmless against any loss
or damage to persons or property as a result of operations growing out of the
performance of this contract and caused by the negligence or carelessness of
Contractor, Contractor's employees, Subcontractors, and agents or licensees. 


Id. at 707. The court determined that this indemnity clause did not meet the express
negligence test, finding that the phrases "any loss" and "as a result of operations" did not
show an intent on Ethyl's part to cover its own negligence. Id. 

 In Glendale Construction Services, Inc. v. Accurate Air Systems, Inc., this Court held
that the following indemnification clause did not meet the express negligence test:

 [T]he Subcontractor shall indemnify and hold harmless . . . the Contractor . . .
from and against all claims . . . arising out of or resulting from the performance
of the Subcontractor's work under this Subcontract provided that any such
claim . . . to the extent caused in whole or in part by a negligent act or
omission of the Subcontractor . . . regardless of whether it is caused in part by
a party indemnified hereunder. 

902 S.W.2d 536, 538-39 (Tex. App.--Houston [1st Dist.] 1995, writ denied).

 The express negligence test is not an affirmative defense; it is a rule of contract 
interpretation. Fisk Elec. Co. v. Constructors & Assoc., 888 S.W.2d 813, 814 (Tex. 1994). 
The intent of the parties must be stated within the four corners of the contact. Ethyl, 725
S.W.2d at 708. 

 The contract between Abercrombie Builders and JMK contains the following
provision in paragraph 10 under General Conditions on the reverse side of the document: 

 Contractor shall in no way be liable for any damage or injury caused to the
person or property of Subcontractor's employees or any third party. 
Subcontractor specifically agrees to indemnify, save harmless and fully
reimburse Contractor, its agents, officers and employees, from all suits, actions
or claims of any character, type or description, brought or made for or on
account of any injuries or damages received or sustained by any person or
persons or property, arising out of or occasioned by, the acts of Subcontractor
or Subcontractor's agents, officers or employees, in the execution and/or
performance of this Contract. Subcontractor shall additionally reimburse
Contractor for any and all expenditures or expenses associated with the
defense of lawsuits arising out of any of the above described circumstances;
provided, however, that Contractor shall have the option to compel
Subcontractor to defend any and all causes of action brought against
Contractor, based in whole or in part upon allegations of negligence on the part
of Subcontractor or Subcontractor's employees, and Subcontractor shall pay
any judgment rendered against Contractor from any such case and shall
reimburse and fully indemnify Contractor for any expenditures or expenses
made or incurred by Contractor for any reason of any such suit or suits
notwithstanding Contractor's option to compel Subcontractor to defend said
suits. 


 Abercrombie Builders argues that the agreement clearly states that "JMK shall
reimburse and fully indemnify [Abercrombie Builders] for any expenditure or expenses"
incurred by such a suit "notwithstanding [Abercrombie Builders'] option to compel [JMK]
to defend such suits." Abercrombie Builders interprets "notwithstanding" to mean "whether
or not" and concludes that that reading shows an agreement to indemnify Abercrombie
Builders "whether or not" Abercrombie Builders could compel JMK to defend it, thus
exculpating Abercrombie Builders from its own negligence. 

 We do not agree with such a tortured interpretation. "Notwithstanding" does not
mean "whether or not;" it means "in spite of." Webster's II New College Dictionary 79
(1995). Therefore, the sentence emphasized by Abercrombie Builders means that, if a claim
is brought against Abercrombie Builders for injuries caused by the acts of JMK, in spite of
the fact that Abercrombie Builders may compel JMK to defend the suit, JMK shall reimburse
Abercrombie Builders for any expenses incurred by Abercrombie Builders resulting from the
claim. Nowhere in the indemnity clause does it expressly state that JMK will indemnify
Abercrombie Builders for expenses incurred in a claim resulting from Abercrombie Builders'
own negligence. Thus, the clause does not meet the express negligence test. 

 In light of our determination that the express negligence test was not met, we need not
consider the conspicuousness requirement, nor need we reach issue 3c regarding whether the
agreement was reasonable or issue 3f regarding the damages award on the indemnity claim. 

 We sustain JMK's issue 3b challenging the indemnity award. 

 Because we have determined that Abercrombie Builders' claim based on breach of
contract is time barred and it has no claim under the indemnity clause of its contract, there
is no basis for an award of attorney's fees. Accordingly, we need not consider JMK's issue
3e regarding the award of attorney's fees to Abercrombie Builders. 

II. ROSENBERG'S APPEAL

 In seven issues, Rosenberg appeals the trial court's granting of JMK's motion for
judgment notwithstanding the verdict with respect to the jury findings on mental anguish. 
Rosenberg also complains that the trial court used the wrong date in its calculation of
prejudgment interest. 

 We need not reach Rosenberg's appeal as it applies to JMK because of our
determination that Rosenberg's causes of action against JMK for negligence and violation
of the DTPA are barred by limitations and that Rosenberg does not have a cause of action
against JMK for breach of an implied warranty. 

 Rosenberg's appeal names Abercrombie Builders as an appellee. However,
Rosenberg does not present any issues regarding Abercrombie Builders. Therefore, we have
nothing to review. 

III. ABERCROMBIE BUILDERS' APPEAL

 Abercrombie Builders complains that the jury's allocation of 40 percent of causation
of Rosenberg's injury to the negligence of Abercrombie Builders is against the
overwhelming weight of the evidence and is clearly wrong and unjust. Abercrombie Builders
argues that Rosenberg's damages were caused solely by JMK's failure to perform the work. 
Thus, Abercrombie Builders contends the evidence is factually insufficient to support the
jury finding that the negligence of Abercrombie Builders and JMK was the proximate cause
of Rosenberg's damages and the finding allocating 40 percent of the causation to
Abercrombie Builders and 60 percent to JMK. 

 A complaint of factual insufficiency of the evidence to support a jury finding must be
preserved in a motion for new trial. Tex. R. Civ. P. 324(b)(2); Tex. R. App. P. 33.1(a). 
Abercrombie Builders did not file a motion for new trial. Therefore Abercrombie Builders
has not preserved its complaint for appeal. 

CONCLUSION


 We have determined that Rosenberg's causes of action for negligence and violations
of the DTPA are barred by limitations, Rosenberg does not have a cause of action for
common-law breach of implied warranty against JMK, Abercrombie Builders' claim for
consequential damages is barred by limitations, and Abercrombie Builders does not have a
contractual right to indemnity for its own negligence. We therefore reverse the judgment of
the trial court and render judgment that Rosenberg take nothing by his suit against JMK and
Abercrombie Builders take nothing by its suit against JMK. 




 Sam Nuchia

 Justice


Panel consists of Justices Cohen, Nuchia, and Price. (7)


Publish. Tex. R. App. P. 47.


1. Tex. Prop. Code Ann. §§ 27.001-.007 (Vernon 2000). 
2. Tex. Bus. & Com. Code Ann. §§ 17.41-.63. (Vernon 1987 & Supp. 2002). 
3. Neither the verdict nor the judgment explains the additional award of $1,100,000 to
Abercrombie Builders. 
4. JMK's issues as presented in its brief are in outline format rather than the customary
numbered format. We have designated JMK's issues as they are designated in JMK's outline
of the "Issues Presented." 
5. Rosenberg would have us find that an express warranty exists by combining a
statement in the architect's building specifications--"The Contractor will perform all of the
Work in a good and workmanlike manner in conformity with generally accepted trade
practices"--with a provision in JMK's contract with Abercrombie Builders--"The
Subcontractor agrees to furnish all labor, material, equipment, services, and supplies required
for a complete job of: Concrete Foundation, according to the plans and specifications dated
2/1/90 revised 5/21/90, 6/6/90 as prepared by Elby S. Martin & Assoc." Clearly, Rosenberg
has not identified an express warranty upon which he may assert a claim. The statement in
the building specifications refers to the contractor. The Subcontract Agreement is between
JMK and Abercrombie. That agreement does not contain any express warranties to third
parties. 
6. JMK's first issue challenges the agreement between Rosenberg and Abercrombie
Builders as a Mary Carter agreement, which our supreme court has declared to be "void as
violative of sound public policy." Elbaor v. Smith, 845 S.W.2d 240, 250 (Tex. 1992). In
the usual Mary Carter agreement, the settling defendant has a stake in the plaintiff's recovery,
often a rebate of some or all of the amount paid by the settling defendant to the plaintiff by
giving the settling defendant a percentage of the plaintiff's recovery in excess of an agreed
amount, thereby providing an incentive for the settling defendant to assist the plaintiff in
maximizing its recovery against the non-settling defendants. It is this collusive arrangement
between two nominally adverse parties that the supreme court condemned as a "sham of
adversity." Id. at 249. 

 Like the typical Mary Carter agreement, the Rosenberg-Abercrombie Builders'
agreement is a collusive agreement creating a "sham of adversity" between Rosenberg and
Abercrombie Builders. The agreement settles the dispute between the plaintiff and one
defendant, while keeping that settling defendant in the lawsuit. Unlike the typical Mary
Carter agreement, it gives the plaintiff a stake in the recovery of the settling defendant-cross
plaintiff against the non-settling defendant, thereby making it in the interest of the plaintiff
and the settling defendant to maximize the settling defendant's recovery. Such an agreement
is as violative of public policy as a typical Mary Carter agreement. 
7. The Honorable Frank C. Price, former Justice, Court of Appeals, First District of
Texas at Houston, participating by assignment.